STATE of Minnesota,
petitioner, Appellant,

v.

David Russell KRAUSHAAR,
Respondent.

No. C4–89–1762.

Supreme Court of Minnesota.

May 24, 1991.

Hubert H. Humphrey, III, Atty. Gen.,
and Tom Foley, Ramsey County Atty., Ste-
ven C. DeCoster, Asst. Ramsey County
Atty., St. Paul, for appellant.

John M. Stuart, State Public Defender, Lawrence Hammerling, Asst. State Public Defender, Minneapolis, for respondent.

## OPINION

YETKA, Justice.

David Kraushaar, Jr., respondent, was convicted of second-degree criminal sexual conduct after a jury trial in Ramsey County District Court. The court of appeals reversed the conviction, holding:

(1) that the state's evidence was, as a matter of law, insufficient to sustain the determination that sexual contact occurred,

(2) that the trial court prejudicially erred in admitting certain testimony by an expert on children's drawings who had examined two drawings made by the complainant, and

(3) that the trial court prejudicially erred (a) in letting the jury replay a videotape of an interview with the complainant which had been admitted in evidence and (b) in telling the jury, in response to a question about whether trial transcripts were available for review, that there were no transcripts available and that the jurors should rely on their memories.

*State v. Kraushaar*, 459 N.W.2d 346 (Minn.App.1990). Although the court of appeals stated that it was granting defendant a new trial, the necessary effect of its determination that the evidence was insufficient is to bar a retrial unless, of course, we reverse the court of appeals' determination that the evidence was insufficient. *Burks v. United States*, 437 U.S. 1, 18, 98 S.Ct. 2141, 2150–51, 57 L.Ed.2d 1 (1978) (double-jeopardy clause bars retrial when a defendant's conviction is reversed because the evidence presented at trial was legally insufficient). Concluding that the court of appeals erred in its analysis of these issues, we reverse and reinstate the judgment of conviction.

### I.

David Kraushaar met Sharon Schroeder, now Armstrong,[1] on her 18th birthday in November 1982. Three months later, they began living together, but never married. Their daughter M. was born in January 1984.

In October 1984, Armstrong moved out, leaving M. with Kraushaar. Paternity and child custody proceedings were commenced. Armstrong and Kraushaar entered into a stipulation which gave joint legal custody to both parents and physical custody to Kraushaar. Armstrong retained the right to visit M. throughout the time M. lived with her father.

In May 1987, Kraushaar and M. moved into a mobile home with Kraushaar's parents. Kraushaar and M. had separate beds but shared a bedroom. Late in 1986, Armstrong applied to family court for physical custody of M. Her motion was denied. In December 1986, Armstrong reported to Ramsey County Child Protection that M. had told her that Kraushaar had "French kissed" M. The county investigated the report but could not substantiate the charges. In August 1988, Armstrong again applied to the court for custody. The court denied her motion on August 30, 1988.

The charge, of which defendant was convicted, had its origin in a conversation Armstrong had with M. one weekend when M. was visiting her. Armstrong testified that M. was sitting on the couch watching television with her. M.'s legs were spread apart and M. had her hand on her lap in the genital area. Armstrong testified that M. asked her "to play with her butt." M. indicated that this is "where she goes to the bathroom." Armstrong asked M. who played with her butt, and M. said her "daddy" (Kraushaar) did. M. then went to her room. Later she came out and showed Armstrong two pictures of stick people she had drawn. Armstrong became concerned about the drawings later when her husband

1. Sharon Schroeder married John Armstrong in mid–1987.

and mother-in-law observed that they depicted genitalia. Armstrong notified Ramsey County Child Protection of possible sexual child abuse.

An intake screener received Armstrong's telephone call and assigned Mary Earl, a social worker, to investigate. Earl interviewed Armstrong on the same day and then called the Ramsey County Sheriff's Department. Deputies removed M. from Kraushaar's residence and placed her in a shelter. The Kennedys, the foster parents who supervise the shelter, were out of town when M. was placed there but returned the following morning. Mrs. Kennedy testified that, while eating breakfast, M. said, "Nobody is supposed to touch nobody here, are they?" M. then said, "Did you hear me?" and repeated her question. M. sat back and pointed to her vaginal area. Mrs. Kennedy agreed with M. and asked if anyone had ever touched her there. M. replied, "Yes, Daddy." Asked with what, she replied, "His hand." The Kennedys testified that, during her stay with them, M. was very sexually precocious for her age, that she would seek out boys and try to sit close to them, and that she did a lot of seductive or flirtatious hair-flinging and batting of her eyelashes. This was corroborated by Mary Earl, who saw her with men in other situations.

Earl took M. to be examined by Dr. Carolyn Levitt, a pediatrician. Dr. Levitt testified as to the protocol she had developed. Her examination is in two parts. One part involves talking with the child in a nonleading way and using anatomical drawings (not dolls) of children and adults. The other part involves a physical examination consisting in part of light touching of the child's genital area and the asking of certain nonleading questions. For 4 years, she has been using a nondistracting, self-operating video recorder to videotape the nonintrusive part of the examination.

The videotape of M.'s examination was admitted in evidence, played for the jury, and sent to the jury room along with the other exhibits that were admitted. Dr. Levitt testified that, when she showed M. the drawing of the girl, she asked M. to name the various parts. When they came to the genital area of the girl, M. said, "Well, that's—my daddy touched me right there." She later said "it hurted" and it "tickled" afterwards. She also said that it happened at night in her dad's bed in the trailer where they lived with his parents. Dr. Levitt testified that her physical examination of the child, not recorded, revealed that everything was normal, but that with a report of mere touching, she would not have expected otherwise. She testified that when she touched M. on the clitoris, M. said her daddy had touched her there; that when she touched her in the anal area, M. denied anyone had touched her there; and that when she touched her in the vaginal area, M. said she touched herself there. That was the extent of Dr. Levitt's testimony on direct examination. However, on cross-examination, defense counsel elicited Dr. Levitt's testimony that, in her opinion, the examination was "consistent" with the child having been abused. She testified further on cross-examination that she typically bases her diagnosis 90 percent on her interaction with the child during the interview and only 10 percent on the rest of the examination.

The trial court held a competency hearing and determined that M., then 5 years old, was competent to testify. M. testified that Kraushaar touched her "where he's supposed to not touch me * * *. He touched me right on my butt." She testified that he touched her with his hands in his bed and in her bed. She also identified the subjects of the two stick drawings as Kraushaar and as Armstrong's husband.

Kraushaar and his parents testified on his behalf. He denied touching M. with sexual or aggressive intent, a required element of second-degree criminal sexual conduct. He stated that he touched M. in the genital or buttocks area only in the course of caregiving—carrying, diapering, and bathing her. He also testified that he told the deputy sheriff that Armstrong was using fabricated accusations in order to get custody of M.

Gilbert Schroephfer, a Ramsey County deputy sheriff, was the investigating offi-

cer in M.'s case. Early in November, he interviewed Julie Kennedy, the foster mother, by telephone. He also talked to Armstrong and to her mother. Kraushaar initiated contact with Schroephfer to respond to the allegations. The Kennedys, Armstrong, the deputy sheriff, Mary Earl, and Dr. Levitt all testified to M.'s statements that her daddy had touched her.

Ann Greenwald, a psychologist, testified as an expert. The prosecutor first mentioned Greenwald to the jury in his opening statement, saying he would be calling her and she would testify as to what the drawings and the child's behavior meant. The defense first elicited testimony relating to the meaning of the drawings in its cross-examination of Deputy Sheriff Schroephfer, the deputy who investigated the case. Asked what the drawings meant to him, the deputy said that the "in between the legs" part of the drawings seemed to have some meaning. Asked a similar question by defense counsel on cross-examination, Mary Earl said that, sometimes when a child is abused, the child will reveal things in his or her drawings and, for that reason, she showed the drawings to a psychologist. On direct examination, Greenwald testified that analysis of children's drawings as an indication of sexual abuse is broadly accepted in the psychological field and that her method was reliable. Greenwald acknowledged that she had never met or interviewed M., but that the reports of interviews and the videotape were available to her.

Greenwald is a licensed psychologist who has been in private practice since 1984. She received her M.A. in school psychology during an internship under Elizabeth Koppitz, whom she described as a leading expert and author of a book on children's drawings. At the time of trial, Greenwald was completing her Ph.D, doing a doctoral internship at Midwest Children's Resource Center. She testified that she went with Koppitz to various schools evaluating children's drawings and that Koppitz personal-

ly trained her in evaluating those drawings. She testified that she herself had analyzed over 2,000 drawings.

Greenwald also testified concerning two studies. One of these studies, by Koppitz, of 1,000 drawings by 128 nonabused 5-year-old public school children revealed that not one of those drawings had genital emphasis. The second study with which she was familiar showed, according to Greenwald's reading of the data, that the children with substantiated abuse were 6.4 times more likely to draw pictures emphasizing genitals.[2] Significantly, defense counsel did not object to this testimony. Greenwald testified that, therefore, a drawing with genital emphasis would make her aware that the child *might* have a history of abuse, *i.e.*, it was a flag of sorts. The prosecutor then described some of M.'s precocious behavior and, without objection, asked if, in consideration with those drawings, Greenwald had an opinion as to the source of M.'s behavior. Greenwald replied that there was "a cluster of behaviors * * * very indicative of abuse." Defense counsel objected when the prosecutor asked what sort of abuse. Defense counsel then was permitted to ask *voir dire* questions of Greenwald. Defense counsel never objected on the ground that interpretation of children's drawings was not sufficiently accepted as reliable in the scientific community; rather, defense counsel objected only to foundation as to Greenwald's expertise and to her giving an opinion without having personally talked with M. Later, during regular cross-examination, defense counsel elicited testimony from Greenwald not only that the drawings indicated that M. was "sexualized" and aware of male organs, but that, in her opinion, there was a "great likelihood" M. had been sexually abused. She admitted on cross-examination that her field of expertise is "not a science in the same sense as measuring blood pressure" but that the drawings are

2. Hibbard, Roghmann & Hoekelman, *Genitalia in Children's Drawings: An Association With Sexual Abuse,* 79 Pediatrics 129 (1987). Their research indicates that alleged sexual abuse victims were five to seven times more likely than comparison children to draw genitalia on human figures. *Id.* at 133.

useful to clinical psychologists as "additional data."

Disagreeing with the court of appeals, we conclude, after reviewing all [3] the evidence in the light most favorable to the verdict of guilty, that the evidence was sufficient to support the conviction.

## II.

■ We address next the question of whether, as the court of appeals held, it was plain error of a prejudicial nature for the trial court to fail to hold a so-called *Frye* hearing on Greenwald's interpretation of M.'s drawings. Under the *Frye* test as adopted by this court, the proponent of the evidence must show that the scientific principle or technique has gained such general acceptance within the scientific community as to render the technique or principle reliable. *State v. Mack*, 292 N.W.2d 764, 767–68 (Minn.1980) (citing *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923)).

The court of appeals, in our view, did not hold that expert testimony on children's drawings emphasizing genitalia is inadmissible under the *Frye* test, or it would not have said that the admission of the evidence was "a matter for a *Frye* hearing, if this evidence is to be used in a new trial." *Kraushaar*, 459 N.W.2d at 350. What the court held is that, even though defense counsel did not object on this ground, the admissibility of the testimony was so questionable that the trial court on its own, without any request by defense counsel, should have held a *Frye* hearing. *Id.*

We need not and do not decide here whether expert psychological evidence should be scrutinized under the *Frye* standard. On the general subject of admission of expert testimony in child sex abuse prosecutions, see *State v. Myers*, 359 N.W.2d 604 (Minn.1984).

There are two reasons why we conclude that defendant is not entitled to any relief from the verdict on the basis of the admission of Greenwald's testimony. First, it is questionable whether, as a general proposition, failure to order a *Frye* hearing in the absence of a request for such a hearing should be deemed to constitute plain error. *See State v. Burns*, 394 N.W.2d 495, 497 (Minn.1986) (a defendant ordinarily cannot obtain relief on appeal from the absence of a pretrial hearing on the admission of evidence if he did not object on that ground); *State v. Dana*, 422 N.W.2d 246, 250 (Minn. 1988) (expert testimony on whether it was the defendant who abused the child was objectionable, but defense counsel did not object).

Second, after reviewing the record, we are also satisfied that, even if admission of Greenwald's testimony may be viewed as an abuse of the trial court's discretion, any error was nonprejudicial. As we indicated earlier, the defense first elicited testimony relating to the meaning of the drawings in its cross-examination of the sheriff's deputy who investigated the case. Asked what the drawings meant to him, the deputy said that the "in between the legs" part of the drawings seemed to have some meaning. We have seen the drawings in question and are satisfied that any reasonable juror looking at the drawings would reach a similar conclusion: that the drawings were unusual drawings for this child to have made. Looking at the drawings and bearing in mind the circumstances under which the child made the drawings, the jury presumably would have concluded on its own that the drawings were corroborative of the child's testimony. Stated differently, it is doubtful that the expert testimony told the jurors much more than the jurors themselves would have surmised from examining the drawings, as they clearly would have done in any event.

## III.

■ We address, finally, the court of appeals' holding that the trial court prejudicially erred in letting the jury replay the videotape of the interview with the complainant and in telling the jury, in response to a question about whether trial tran-

---

**3.** In reviewing sufficiency of evidence, courts should include any erroneously admitted evidence; otherwise, the state would have an incentive to "over-try" cases. *Lockhart v. Nelson*, 488 U.S. 33, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988).

scripts were available for review, that there were no transcripts available and that the jurors should rely on their recollection.

The materials that may go to the jury room and jury requests for review of evidence are governed by Minn.R.Crim.P. 26.-03, subd. 19(1) and (2):

(1) *Materials to Jury Room.* The court shall permit the jury, upon retiring for deliberation, to take to the jury room exhibits which have been received in evidence, or copies thereof, except depositions and may permit a copy of the instructions to be taken to the jury room.

(2) *Jury Requests to Review Evidence.*

1. If the jury, after retiring for deliberation, requests a review of certain testimony or other evidence, the jurors shall be conducted to the courtroom. The court, after notice to the prosecutor and defense counsel, may have the requested parts of the testimony read to the jury and permit the jury to re-examine the requested materials admitted into evidence.

2. The court need not submit evidence to the jury for review beyond that specifically requested by the jury, but in its discretion the court may also have the jury review other evidence relating to the same factual issue so as not to give undue prominence to the evidence requested.

Minn.R.Crim.P. 26.03, subd. 19(1), (2) (1991). The trial court has broad discretion under the rule. *State v. Daniels*, 332 N.W.2d 172, 177 (Minn.1983).

The defendant argues that the trial court erred in two respects when it permitted the jury to review a videotape in the jury room. First, the videotape should not have been sent to the jury room because it was testimonial in nature and thus like a deposition, and subdivision 19(2) prohibits depositions from going to the jury room. Second, the jury was permitted unsupervised use of the videotape without being conducted to open court for review in violation of subdivision 19(2). As a result, the defendant argues, his case was prejudiced.

As stated in the comment to section 5.1(a) of the original ABA Standards Relating to Trial by Jury (1st ed.1968), "[a] few states have imposed substantial limitations upon what materials may be sent to the jury room, but the general rule is that books of account, X-ray plates and pictures, photographs, maps and plats, writings, and physical objects generally, if admitted into evidence, may be taken by the jury when retiring." Minnesota has long followed what the comment refers to as the "broader and prevailing view." *Id. See, e.g.,* Minn.Stat. § 631.10, repealed 1979 ch. 233, § 42, the substance of which was adopted by Minn.R.Crim.P. 26.03, subd. 19(1), which now governs. Rule 26.03, subd. 19(1) provides:

The court shall permit the jury, upon retiring for deliberation, to take to the jury room exhibits which have been received in evidence, or copies thereof, except depositions and may permit a copy of the instructions to be taken to the jury room.

Interestingly, unlike the corresponding provision of the ABA Standards,[4] the rule uses the mandatory "shall" rather than the permissive "may." It is, therefore, not surprising that many trial courts routinely allow anything admitted in evidence except "depositions" to accompany the jury to the room.

---

**4.** ABA Standard 15–4.1 (2d ed.1980), which is nearly identical to the original ABA Standard on this subject [ABA Standards Relating to Trial by Jury 5.1(a) (1st ed.1968)], provides:

(a) The court in its discretion may permit the jury, upon retiring for deliberation, to take to the jury room a copy of the charges against the defendant and exhibits and writings which have been received in evidence, except depositions, and with the consent of both parties copies of instructions previously given.

(b) Among the considerations the court should take into account in making this determination are:

(i) whether the material will aid the jury in proper consideration of the case;

(ii) whether any party will be unduly prejudiced by submission of the material; and

(iii) whether the material may be subjected to improper use by the jury.

However, a careful review of relevant decisions of this court interpreting the rule makes it clear that trial courts should exercise caution and discretion. In the interests of aiding trial courts in this respect, we offer the following analysis.

As the rule makes clear, trial courts may not allow "depositions" to be taken to the jury room. In criminal prosecutions in Minnesota, there is no such thing as a "discovery deposition." *State v. Rud,* 359 N.W.2d 573, 578 n. 1 (Minn.1984). The "deposition" referred to in Minn.R.Crim.P. 26.03, subd. 19(1) is a deposition to preserve testimony when there is a reasonable probability that the witness will be unavailable to testify at trial. *See* Minn.R.Crim. P. 21 and comment thereto. As stated in the comment to section 5.1(a), ABA Standards Relating to Trial by Jury (1st ed. 1968), "[t]he rationale behind this position is that to permit depositions to be taken to the jury room would result in the jury rereading them and examining them and thus either giving them greater emphasis or subjecting them to closer criticism than the testimony of the witnesses who appeared in court." The videotaped interview conducted by Dr. Levitt, in our view, was not a "deposition" within the meaning of the rule nor something "sufficiently akin" to a "deposition" to be precluded by the rule. *Adrian v. Edstrom,* 304 Minn. 52, 59, 229 N.W.2d 161, 166 (1975) (civil case holding that transparency containing figures which was projected on a screen for viewing by jury during trial and admitted in evidence was not a "deposition" under section 546.15, which provided that jury could take to jury room "all papers received in evidence except depositions," and, therefore, it was within trial court's discretion to send the transparency to jury room pursuant to the statute).

■ The fact that the rule does not preclude the trial court from allowing the jury to take an exhibit to the jury room for deliberations does not mean that the trial court has unreviewable discretion to allow the jury to do so. Our cases support the view that the trial court's discretion necessarily must be broad, but that the discre-

tion is reviewable pursuant to an abuse-of-discretion test. ABA Standard 15–4.1, quoted in full *supra* at n. 4, lists three of the considerations the trial court should take into account in exercising its discretion:

(i) whether the material will aid the jury in proper consideration of the case;

(ii) whether any party will be unduly prejudiced by submission of the material; and

(iii) whether the material may be subjected to improper use by the jury.

A number of decisions of this court shed light on this issue. In *State v. Gensmer,* 235 Minn. 72, 51 N.W.2d 680 (1951), *cert. denied,* 344 U.S. 824, 73 S.Ct. 24, 97 L.Ed. 642 (1952), this court held that a defendant's audiotaped confession which is admitted in evidence is not like a deposition and is among the materials ordinarily sent to the jury room. The court said:

The statement was taken from defendant by means of a recording machine, and later a transcript of the statement was taken from the record. That is the modern substitute for a statement in longhand. It accomplishes the same purpose, but more expeditiously and more correctly. Defendant complains that the recording machine may be started and stopped at convenience and it does not record the conversations which took place when it was not in action. That observation can with equal force be made with reference to statements taken in longhand. No one questions that statements in longhand which have been properly received in evidence may be taken by the jury into the jury room. We can see no reason why the mechanism and the mechanized version of the statement may not also be received in evidence. In the latter case, no one can question the accuracy of the reproduction of the statements made by the person being questioned.

235 Minn. at 81, 51 N.W.2d at 686. This court upheld the trial court when it permitted *Gensmer*-like audiotapes to go to the jury room in *State v. Barbo,* 339 N.W.2d 905, 906 (Minn.1983) (trial court properly

admitted tapes of phone conversation in which defendant made incriminating statements and properly permitted the jurors to take the tapes with them to the jury room. *See also State v. Graham,* 371 N.W.2d 204, 209 (Minn.1985) (defendant, on appeal, complained of trial court's denial of request to see videotape re-enactment of dogs tracking defendant after murder because tape was shown for illustrative purposes only and was not in evidence; "not being in evidence, the jury cannot use it in its deliberations"); *State v. Fossen,* 282 N.W.2d 496, 508–09 (Minn.1979) (defendant, on appeal, complained of trial court's not letting jury take taped statement to jury room; this court said that, under the rule, the trial court has discretion to preclude some exhibits from being taken to the jury room but that trial court did not abuse the discretion in that case, particularly since the trial court admonished the jury at the time the tape was played that it would hear the tapes only once).

Although the trial court's exercise of its discretion is subject to review, the mere fact that the trial court may be said to have erred or abused its discretion under the rule does not mean that a defendant is entitled to a new trial. Indeed, numerous cases have held that harmless-error analysis applies even where evidence which was *not* admitted in evidence somehow wrongly makes its way into the jury room during deliberations. *United States v. Birges,* 723 F.2d 666, 670 (9th Cir.), *cert. denied,* 466 U.S. 943, 104 S.Ct. 1926, 80 L.Ed.2d 472 (1984); *United States v. Warner,* 428 F.2d 730 (8th Cir.), *cert. denied,* 400 U.S. 930, 91 S.Ct. 194, 27 L.Ed.2d 191 (1970). *Cf. State v. Rean,* 421 N.W.2d 303, 305–07 (Minn. 1988) (rejecting argument that any error under Minn.R.Crim.P. 26.03, subd. 19(2) necessarily is prejudicial error requiring new trial); *State v. Kindem,* 338 N.W.2d 9, 16–17 (Minn.1983), *cert. denied,* 466 U.S. 974, 104 S.Ct. 2352, 80 L.Ed.2d 825 (1984) (applying harmless-error rule to error by trial court in answering jury's question during deliberations without complying with Minn.R.Crim.P. 26.03, subd. 19(2), (3) regarding notification of counsel and defen-

dant); *accord State v. Richardson,* 332 N.W.2d 912 (Minn.1983).

In the instant case, if defense counsel was concerned about the issue, he could have discussed it with the trial court earlier. The trial court might have exercised its discretion under *Fossen* and told the jury that they should listen to the videotape carefully because they would see and hear the tape only once. Instead, defendant, by stipulation, agreed to the admission of the videotape in evidence and apparently did not object to its going to the jury room. Since the videotape was admitted in evidence and accompanied the jury to the jury room, the jury understandably felt that it was entitled to review the tape. It accordingly asked the trial court for a videotape player when it decided to view the tape again. While it is doubtful that the trial court abused its discretion in letting the jury review the tape, the state concedes, and we agree, that it would have been preferable for the review to have taken place in the courtroom rather than in the jury room. We are satisfied that any error in this regard was nonprejudicial error because: (i) the videotape viewed in the jury room was no different from the videotape that the jury would have seen in the courtroom, (ii) at worst, the replaying of the tape allowed the jury to rehear what it had already heard, (iii) the testimony of the victim was positive and consistent and was corroborated by other evidence, and (iv) it is extremely unlikely that the replaying of the tape by the jury affected the verdict as by prompting the jury to convict where it otherwise would not have done so.

Our decision in *State v. Rean,* 421 N.W.2d 303, 305–07 (Minn.1988), summarizes the applicable cases and principles with respect to the jury's question relating to the existence of transcripts. While we agree that the trial court should have handled the jury's request differently, we disagree with the court of appeals' conclusion that prejudicial error was committed. If defense counsel had wanted to preserve the claim of error, the defense should have asked the trial court to question the jurors in open court in an attempt to clarify the jurors' request. If the jurors had asked

for the court reporter to reread M.'s or Dr. Levitt's testimony, defense counsel might have objected on the ground that rereading the testimony would give undue emphasis to it. We do not believe that the record on appeal establishes that any error in answering the jury's question as the court did was prejudicial in nature.

In summary, we conclude that defendant received a fair trial and was properly convicted of criminal sexual conduct in the second degree. Accordingly, we reverse the decision of the court of appeals and reinstate the judgment of conviction.

Reversed and judgment of conviction reinstated.

TOMLJANOVICH, Justice (dissenting).

Because I cannot agree with the majority that permitting jurors unsupervised review of a videotaped interview of the victim constitutes "harmless error," I dissent. Allowing a jury to view such a videotape at its discretion is tantamount to sending the alleged victim herself into the jury room. I simply cannot imagine anything more prejudicial to a defendant than permitting the jury hearing her or his case to view and review the videotaped allegations of a four-year-old child.

The Rules of Criminal Procedure, which were adopted before videotapes were widely available, are silent as to their use in court. Rule 26.03, however, provides the procedure to be followed whenever jurors request to review evidence presented at trial:

> 1. If the jury, after retiring for deliberation, requests a review of certain testimony or other evidence, the jurors shall be conducted to the court room. The court, after notice to the prosecutor and defense counsel, may have the requested parts of the testimony read to the jury and permit the jury to rexamine the requested materials admitted into evidence.

Minn.R.Crim.P. 26.03, subd. 19(2)(1991). This procedure should have been followed. The trial court should have accepted the videotape into evidence. When the jury requested to review it, the jurors should have been conducted back into the court-room after notice had been given to both the prosecutor and defense counsel. A record should have been made of the jury's request, which portions of the tape were replayed, and any comments made by members of the jury, counsel, the defendant, or the trial court. Straying from this procedure and permitting the jury unlimited access to this single piece of highly prejudicial evidence clearly constitutes reversible error. I would remand the case for a new trial. •

SIMONETT, Justice (dissenting).

I join Justice Tomljanovich's dissent. In this instance, with credibility of the two main actors critical, to permit the complaining witness to appear "live" in the jury room (by video), alone with the jurors, with no one present to at least remind the jurors of another side to the case, was prejudicial error.

In my view, the *Frye* test is not applicable to the behavioral sciences, and, therefore, defendant was not entitled to a *Frye* hearing even if he had asked for one. *See People v. Beckley*, 434 Mich. 691, 456 N.W.2d 391 (1990). When a new device or technique in the hard sciences seeks admission in the courts (such as deoxyribonucleic acid testing), *Frye* requires a threshold hearing to decide if the scientific basis for the new development—a basis unlikely to be understood by those without the necessary scientific expertise—is reliable.

Studies in the behavioral sciences showing that sexually abused children are more likely than other children to draw genitalia on human figures involves a different order of reliability; if this information is helpful within the meaning of Rule 702 (and its probative worth outweighs any prejudice), it may be admitted in evidence. If the trial court had refused to admit the expert testimony with its rather problematical conclusions, I would have affirmed. On the other hand, I think the record made here, particularly in view of the somewhat belated and misfocused objections, extended the range of the trial court's discretion

so that allowance of the expert testimony is also affirmable.