**STATE of Minnesota, Respondent,**

v.

**Marvin HAYNES, Jr., Appellant.**

**No. A05–2444.**

Supreme Court of Minnesota.

Jan. 4, 2007.

Marie Wolf, Assistant State Public Defender, Minneapolis, MN, for Appellant.

Michael A. Harch, Minnesota Attorney General, St. Paul, MN, Amy J. Klobuchar, Hennepin County Attorney, Thomas A. Weist, Assistant County Attorney, Minneapolis, MN, for Respondent.

OPINION

GILDEA, Justice.

After trial by jury in Hennepin County District Court, Marvin Haynes, Jr., was found guilty and convicted of first-degree murder and second-degree assault. He appeals to this court, claiming (1) he was denied a fair trial when the district court granted the jury's request during deliberations to replay a tape-recorded statement; (2) the prosecutor committed misconduct; and (3) he was denied a fair trial because the district court allowed the state to ask him about his prior contact with the police. We affirm.

On May 16, 2004, C.M. was working at Jerry's Flower Shop in Minneapolis. C.M.'s brother, H.S., was also at the shop that morning, when a person entered the store and asked for a flower arrangement for his mother's birthday. The person pointed out a vase of flowers that he liked, but said that he wanted it a bit fuller and bigger. As C.M. was arranging the flowers, she looked up and saw a gun about twelve inches from her face.

The person said, "I'm not joking with you" and "I want the money." H.S. approached from behind or from the side of C.M. and told the gunman that they did not have any money in the store and he did not even have any money in his billfold. The man moved the gun away from C.M.

and she ran for the back door. As she fled, C.M. heard two shots. She ran toward a neighbor's house and turned back to see the gunman quickly walking down the alley.

The neighbor called 911, and C.M. briefly spoke to the 911 operator. C.M. told the 911 operator that the shooter was an African–American male, in his early twenties, about 5′10″ or 5′11″, about 180 pounds, and had a thin build. When the police arrived at the scene, they found that H.S. had died from gunshot wounds.

C.M. was shown a lineup on May 17, 2004, and selected an individual whom she was 75 to 80 percent sure looked like the suspect. The individual she selected, however, was in South Dakota at the time of the murder. At a subsequent photo lineup, C.M. identified Haynes as the gunman. Later, C.M. "got right off the chair" and identified Haynes from a live lineup. She also identified Haynes in court as the person she saw in the flower shop on May 16 with the gun.

At trial, Haynes's cousin, I.H., testified that he had given a statement to the police on May 28, 2004. In the statement, which was tape-recorded and played for the jury at trial, I.H. said that Haynes told him on May 16 that Haynes was going to "hit a lick." I.H. understood this to mean that Haynes was going to commit a robbery. I.H. also told police that Haynes's friend, D.B., had a gun. Finally, I.H. told the police that Haynes later called I.H. and told him that Haynes had used D.B.'s gun to shoot a white man on the corner "because he wouldn't give up the money."

I.H. also testified, however, that he did not remember whether he was with Haynes on the morning of May 16, 2004, and that his statement to the police on May 28 was not the truth. He further testified that he "just made up that because they threatened me with 15 years,"

and that he committed perjury at the grand jury hearing when he testified in accordance with his May 28 statement. I.H. contradicted himself later during his testimony when he said that he remembered what happened on May 16, 2004, and that what he told police in his May 28 statement was the truth.

A.T. also testified that he was with Haynes the morning of the murder and that Haynes said he was going to "hit a lick." Another witness, J.C., testified that she had seen Haynes and a few of his friends the morning after the murder and that Haynes said "he had shot some old white man." J.C. also testified that she saw Haynes at his house and that Haynes said he could not come out because the police were looking for him. Finally, J.W. testified that she had a conversation with Haynes in which Haynes bragged about shooting a man at the flower shop.

Haynes testified in his own defense. He testified that he "never shot anybody" and that he did not try to rob the flower shop. He also testified that he was not even on the block or in the neighborhood of the flower shop on May 16, and that he had previously told the police that he did not know where the flower shop was. He stated that on the night of May 15, he was at his girlfriend's house until about two or three in the morning and then went home and slept on the couch until about three or four in the afternoon of May 16.

During deliberations, the jury asked the district court to replay the tape of the 911 call to police and I.H.'s taped statement to the police. The court complied with the requests by bringing the jury back into the courtroom and playing each tape once. A few hours after hearing the tapes, the jury came back with its verdict, finding Haynes guilty of first-degree murder and second-degree assault. The court convicted

Haynes and sentenced him to life in prison on the murder count plus 36 months on the assault count.

## I.

Haynes first claims that he was denied a fair trial because the district court granted the jury's request to replay I.H.'s taped statement during deliberations. We review the district court's ruling under an abuse-of-discretion standard. *State v. Kraushaar*, 470 N.W.2d 509, 515 (Minn.1991).

I.H.'s tape-recorded statement was an exhibit in the case that was played during trial and given to the jury.[1] If a deliberating jury asks to review "certain testimony or other evidence," a district court should conduct the jurors to the courtroom. Minn. R.Crim. P. 26.03, subd. 19(2)(1). The court "may have the requested parts of the testimony read to the jury and permit the jury to re-examine the requested materials admitted into evidence." *Id.* The court also has the discretion to "have the jury review other evidence relating to the same factual issue so as not to give undue prominence to the evidence requested." *Id.*, subd. 19(2)(2).

Haynes contends that the district court failed to adhere to this court's ruling in *Kraushaar*, and that the district court did not adequately weigh the reasonableness of the jury's request to replay I.H.'s statement against the prejudice to Haynes. We disagree.

In *Kraushaar*, a criminal sexual conduct case, a videotape was made of a pediatrician's interview with the child victim. 470 N.W.2d at 510–511. The videotape was played for the jury during trial and was sent into the jury room along with the exhibits. The jury also received equipment necessary to review the videotape in the jury room. *Id.* at 511, 516. The defendant claimed that the court erred in permitting the jury to watch the videotape in the jury room. *Id.* at 514. We held that any error in the court's decision to allow the jury to review the videotape in the jury room did not require reversal. *Id.* at 516.

The district court in this case followed the analysis we offered in *Kraushaar*. We said in *Kraushaar* that "it would have been preferable" for the court to have had the jury review the videotape in the courtroom, rather than allowing the jury to replay the videotape in the jury room. Id. The court in this case did precisely what we termed the "preferable" practice in *Kraushaar*.

The district court also assessed the issue of potential prejudice. The court considered whether the material "would aid the jury in proper consideration of the case" and whether "any party would be unduly prejudiced." The court concluded that Haynes would not be unduly prejudiced by the replaying of I.H.'s statement, particularly because the jury also requested to rehear the 911 tape. As the court noted, the 911 tape was arguably more consistent with the defense's version of the case.[2] The court also considered whether the jury could have used the material improperly, but concluded that it could not do so if the tape was played only once in open court.

Haynes correctly notes that the district court had the discretion to require that the jury review other portions of I.H.'s testimony and to caution the jury to avoid placing too great an emphasis on the re-

---

1. The district court instructed the deputy, however, that the jury was not to be given a tape player.

2. Haynes argued that he was younger and shorter than the person C.M. described during the 911 call.

corded testimony. But the court was not required to take such actions under our rules of criminal procedure. *See* Minn. R.Crim. P. 26.03, subd. 19(2)(2). The court's analysis was consistent with our court rule and the guidance set out in *Kraushaar.* We hold that the district court did not abuse its discretion in replaying for the jury, once in open court, I.H.'s taped statement together with the tape of the 911 call.

## II.

■ Haynes next claims that because of several instances of prosecutorial misconduct, he is entitled to a new trial. Our jurisprudence recognizes that district courts are in the best position to monitor the conduct of prosecutors and assess the impact, if any, of alleged misconduct. *State v. Ramey,* 721 N.W.2d 294, 298 (Minn.2006); *see also State v. Steward,* 645 N.W.2d 115, 121 (Minn.2002). We have said that to determine "whether a prosecutor engaged in prejudicial misconduct is largely within the discretion of the trial court and we will reverse only where the misconduct, viewed in light of the entire record, is of such serious and prejudicial nature that appellant's constitutional right to a fair trial was impaired." *State v. Robinson,* 604 N.W.2d 355, 361 (Minn. 2000). Our review of the record leads us to conclude that the district court properly performed its monitoring function here and that reversal is not warranted on the basis of prosecutorial misconduct.

Haynes contends that the prosecutor committed misconduct by disobeying the district court's order not to ask A.T. about his fear of Haynes. In October 2004, A.T. told police that Haynes said he was going to "hit a lick." But A.T. had not related this comment from Haynes to the police when they interviewed A.T. on June 18. The prosecutor apparently sought to es-

tablish that the reason A.T. did not tell the police about Haynes's comment during the June 18 interview was because A.T. was afraid of Haynes. The record indicates that the prosecutor sought direction from the court in a bench conference (the contents of which were not transcribed) before asking the allegedly improper question. Following the bench conference, the prosecutor asked A.T., "[a]nd you didn't tell [the police officer] when you first met him on June 18th, 2004 because you were afraid of [Haynes], right?" The defense objected to the question as "leading," and the district court sustained the objection. But the transcript reflects that A.T. had already answered "yeah" to the question. After A.T. was excused, the defense asked for a mistrial and argued that the prosecutor had violated the ruling the district court had made during the bench conference. The prosecutor stated that he thought the court had given him permission to ask the question, and acknowledged that he must have misunderstood the court's ruling. Anticipating a claim of prosecutorial misconduct, the prosecutor then asked the court to make a finding as to whether the prosecutor intentionally violated the court's order. The court indicated that its ruling may have been unclear, and found that the prosecutor did not deliberately violate the court's order. The court also ruled that the question was not so prejudicial as to require a mistrial.

Our review of the record leads us to conclude that there was not prosecutorial misconduct related to this issue. The prosecutor properly sought guidance from the district court before proceeding into the area. *See State v. McRae,* 494 N.W.2d 252, 259 (Minn.1992) ("Any time a prosecutor desires to make an inquiry of doubtful propriety, the prosecutor should seek permission from the trial court in chambers before asking the question."). The court specifically found that the prosecutor had

not deliberately violated its ruling, and the record reflects that the prosecutor thought the court had given the prosecutor permission to pose the question. The incident was isolated, confined to one question, and was not the type of attack this court has held to constitute prosecutorial misconduct in the past. *See State v. Harris,* 521 N.W.2d 348, 352 (Minn.1994) ("The cumulative effect of these continuous references to witnesses' fear was to create the inference that Harris was of bad character and had a propensity to commit crimes of violence."). We conclude that the question posed to A.T. was not prosecutorial misconduct on this record.

■ Haynes also alleges that the prosecutor committed misconduct by improperly implying that the defense had a duty to produce witnesses. We have said that prosecutors commit misconduct if they attempt to shift the burden of proof to the defendant. *State v. Coleman,* 373 N.W.2d 777, 782 (Minn.1985). Haynes did not claim during trial that the line of questioning at issue improperly shifted the burden of proof.[3] Accordingly, we review the claim of misconduct for plain error. *Ramey,* 721 N.W.2d at 299.

This claim of misconduct is based on the prosecution's cross-examination of Haynes. Haynes testified that he was at home asleep at the time of the murder. The line of questioning at issue established that Haynes's mother and sisters were home and could have seen him when he was sleeping on the couch. Ultimately, the prosecutor concluded the line of questions

by asking: "It stands to reason that these four people saw you sleeping on the couch at the time when the murder at the flower shop took place, isn't that right?" Haynes suggests that this was the same as commenting on his failure to call witnesses. But the prosecutor did not comment directly on Haynes's failure to call a witness. The cross-examination at issue was isolated, accounting for only three of forty-five pages of the cross-examination, and the prosecutor made no reference during his closing argument to this portion of the cross-examination or to the absence of testimony from the people Haynes testified saw him sleeping at the time of the murder. *See State v. Morton,* 701 N.W.2d 225, 235 (Minn.2005) (concluding that misconduct was plain error where prosecutor asked improper "were they lying questions" and then "emphasized [the] impression" created by these questions during closing argument). Thus, we hold, on this record, that any misconduct related to these questions was not plain error.[4]

### III.

■ Haynes's final argument is that he was denied a fair trial because the district court allowed the state to ask him about his prior contact with the police. We review this evidentiary ruling under an abuse-of-discretion standard. *State v. Penkaty,* 708 N.W.2d 185, 201 (Minn.2006).

■ On cross-examination, the state asked Haynes if he previously had lied to the police on two specific occasions.[5]

---

**3.** He lodged only a foundation objection to one of the several questions he now says were prosecutorial misconduct.

**4.** We have examined Haynes's other claims of misconduct and find them to be without merit on this record.

**5.** Haynes admitted that he gave false identifying information to the police on two occa-

sions. The state gave the appropriate notice in this case that if Haynes testified it would seek to impeach him with evidence of these lies and with evidence of his contacts with police "in proximity of the flower shop." *See State v. Fallin,* 540 N.W.2d 518, 522 (Minn. 1995) ("The proper approach [is] for the prosecutor to give pretrial notice, which [gives] the defendant an opportunity to request a

Haynes argues that the district court abused its discretion by allowing the state to attempt to impeach Haynes with these questions. Haynes notes that he was a juvenile during the relevant time periods and that Minn. R. Evid. 609(d) forbids the use of juvenile adjudications for the purpose of attacking the credibility of a witness. Accordingly, Haynes argues, "[i]f a juvenile adjudication is not admissible to impeach, then certainly a stop or arrest is not."

Relevant legal authority does not support Haynes's argument. Minnesota Rule of Evidence 608(b) states that specific instances of conduct of a witness may, in the discretion of the district court, be inquired into on cross-examination of the witness concerning the witness's veracity. The rule explicitly acknowledges that such inquiries may be directed at the accused and there is no exception for juveniles in the rule. Minn. R. Evid. 608. The comment to the rule suggests, however, that in criminal cases, courts should be cautious about allowing such evidence to be admitted "if it tends to involve matters that might prejudice the jury." Id. comm. cmt.—1977. The record indicates that the district court conducted a cautious examination of the potential for prejudice. The court considered the issue in advance and told counsel "that if the defendant testifies [the prosecution] could use the two instances of lying to the police because I felt that was something that was legitimate and that it demonstrated that he was not truthful with the police." We hold that the court did not abuse its discretion in allowing this cross-examination.[6]

■ The state also asked Haynes on cross-examination about being stopped on several occasions in the neighborhood of the flower shop. Haynes contends that this evidence should not have been admitted because it was irrelevant and highly prejudicial. But Haynes testified that he was not familiar with either the flower shop or the area in which the shop was located. Haynes's responses to the state's questions revealed that Haynes had talked to police several times in the area in which the shop was located. Accordingly, this testimony was relevant to Haynes's credibility.

■ Haynes argues, however, that even if the evidence was relevant to his credibility, it should have been excluded because it was too prejudicial. Minnesota Rule of Evidence 403 allows a court to exclude relevant evidence if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." The district court considered the issue of unfair prejudice when it found that Haynes's prior police contact would be admissible. The court said: "With regard to the contacts with law enforcement, * * * if [Haynes] denied being familiar with the area around the flower shop, then the prosecutor could put in several of those stops and the location of those stops to demonstrate where they occurred." The record reflects that the prosecutor, consistent with the court's ruling, asked Haynes a series of questions regarding his contacts with police in the area near the flower shop. After the prosecutor went through a few of these contacts, Haynes objected to further examina-

---

hearing on the issue before making a decision as to whether or not to testify.").

**6.** Haynes also contends that, in closing argument, the prosecution argued that the incidents of lying to police were a basis for conviction. The record does not support this

claim. The prosecution made its comments about Haynes's lies to the police in the context of discussing the "credibility or believability of the individual witnesses, including the defendant."

tion on this subject on the basis of Minn. R. Evid. 403. In response to this objection, the court told the prosecutor he could ask about two more incidents but "it would be getting too prejudicial to do any more" after that.

We conclude that the district court did not abuse its discretion in allowing the limited cross-examination. Haynes testified on direct examination that he had previous contact with the police. The state did not ask about the reasons for Haynes's contacts with police. The jury was informed only that Haynes had previously spoken with the police at different locations in the neighborhood of the flower shop. Finally, the court carefully monitored the examination to avoid improper prejudice. For these reasons, we hold that the district court did not abuse its discretion by allowing the state to ask Haynes about these incidents.

Affirmed.