**STATE of Minnesota, Respondent,**

v.

**Jermaine Sean BROWN, Appellant.**

**No. A05–1041.**

Supreme Court of Minnesota.

June 7, 2007.

John Stuart, State Public Defender, Marie L. Wolf, Assistant State Public Defender, Minneapolis, MN, for Appellant.

Lori Swanson, Minnesota Attorney General, Thomas Rolf Ragatz, Assistant Attorney General, St. Paul, MN, Christopher James Rovney, Blue Earth County Attorney Office, Mankato, MN, for Respondent.

## OPINION

ANDERSON, RUSSELL A., Chief Justice.

A Blue Earth County jury found appellant Jermaine Brown guilty of aiding and abetting a conspiracy to commit controlled substance crime in the second degree in violation of Minn.Stat. §§ 152.022, subd. 1(1), 152.096, and 609.05 (2006). A divided court of appeals affirmed, rejecting Brown's claims of erroneous evidentiary rulings, insufficient evidence to convict, and ineffective assistance of counsel for failure to challenge a biased juror. *State v. Brown,* No. A05–1041, 2006 WL 2052962 (Minn.App. July 25, 2006). We reverse, concluding that the evidence was insufficient for conviction.

The conviction arises out of three separate cocaine sales, the first occurring on August 27, 2004, and the second and third occurring on September 1, 2004.

*First Sale*

On August 27, 2004, a Confidential Reliable Informant (CRI) informed police that an individual, P.K., had offered to bring the CRI to P.K.'s source for crack cocaine. The police provided the CRI with an electronic monitoring device and $300 in recorded currency and directed the CRI to purchase an "eight ball" of crack cocaine. The CRI and P.K. drove to the apartment of Jerome Slack and asked to buy crack cocaine from Slack. Slack apparently called his source for the crack cocaine and informed the CRI that he needed to drive to his source to obtain the crack cocaine.

Slack, who was followed by police, drove alone to an apartment complex, entered, and shortly thereafter exited a building in the complex. As Slack was leaving the complex, a red Pontiac Grand Prix entered the lot, momentarily stopping by Slack's car. Slack turned his car around, parked

next to the red Pontiac and again entered the building he had just left. Police learned that the red Pontiac was registered to Maria Esquivel, Brown's girlfriend, and that Esquivel and Brown lived in an apartment in the building that Slack had just entered. The police, who were unable to determine who was driving the red Pontiac, later saw Slack leave Brown and Esquivel's apartment and drive off in his car. Slack returned to his apartment where the CRI and P.K. were waiting, and gave crack cocaine to the CRI. The CRI later gave police the crack cocaine and a small amount of the recorded currency not used in the purchase.

*Second Sale*

On September 1, 2004, the police instructed the CRI to purchase an additional $450 of crack cocaine from Slack. Police observed the CRI and Slack drive separately to a gas station, where the CRI waited. Slack drove on until he met Esquivel's red Pontiac, which was driven by Brown. There are three different accounts of what happened next from the three surveilling officers. One officer saw Brown reach out of the car window across to Slack's vehicle but could not see if Slack reached out; another officer saw the vehicles pass one another without stopping; a third officer saw the two vehicles stop side by side for about 2 minutes, but saw neither driver reach out of the vehicles. After the two cars passed one another, Brown went to the gas station where the CRI was waiting but made no contact with the CRI. Slack drove on to the duplex residence of Brown and Esquivel. Apparently, Brown and Esquivel had moved from the apartment in which they were living on August 27. Police saw Slack enter the main door of the two-unit duplex, but did not see which unit he entered. Brown arrived and also entered the main door of the duplex. After a short while, Slack left the duplex and drove to the gas station where the CRI was waiting. Police and the CRI met later at a predetermined location and the CRI gave the police the crack cocaine he had purchased from Slack.

*Third Sale*

Later on September 1, the CRI made a second purchase of crack cocaine from Slack. Again under police surveillance and equipped with an electronic monitoring device, the CRI returned to the gas station and met Slack, who had an unidentified passenger with him. Slack drove to Brown and Esquivel's duplex residence. Slack entered the main door of the duplex and, approximately 25 minutes later, left the duplex, returned to the gas station, and met the CRI. The CRI later gave police the crack cocaine purchased from Slack.

On September 3, 2004, in a search by warrant of Brown and Esquivel's duplex residence, police seized from a kitchen cabinet plastic baggies, "corner cuts" of plastic baggies, commonly used to package powder or rock narcotics, and a digital scale with a small amount of residue on it, too little for testing. In a purse containing Esquivel's state ID card, the police seized three recorded $100 bills used in the controlled purchases. Police found no cocaine in the home. The BCA later determined that the CRI had purchased from Slack a total of 3.2 grams of crack cocaine.

At trial, Slack testified that he was a drug user who did not remember much from the time period in question. When asked about arranging for a crack cocaine purchase for P.K. and about the other events of August 27 and September 1, 2004, Slack claimed he did not remember any of it. Slack denied ever purchasing drugs from Brown.

## I.

■ When considering Brown's claim that the evidence was insufficient for conviction, we make a painstaking review of the record to determine whether the evidence and reasonable inferences drawn therefrom, viewed in a light most favorable to the verdict, were sufficient to allow the jury to reach its verdict. *State v. Pendleton*, 706 N.W.2d 500, 511 (Minn.2005).

Brown was neither charged with nor convicted of selling contraband or aiding and abetting the sale of contraband. Instead, he was charged and convicted of aiding and abetting a conspiracy. Although Minnesota courts have never addressed the viability of an aiding and abetting a conspiracy charge, several federal courts have upheld this type of charge. *See United States v. Galiffa*, 734 F.2d 306, 310–11 (7th Cir.1984) (explaining that the Fifth and Ninth Circuits recognize the aiding and abetting a conspiracy charge). These federal courts have recognized that a defendant does not aid or abet a conspiracy merely by aiding and abetting the commission of the crime which is the object of the conspiracy, nor does a defendant aid and abet a conspiracy by mere association with members of a conspiracy. *See, e.g., United States v. Miller*, 552 F.Supp. 827, 830 (N.D.Ill.1982). But if it is shown that a defendant knew that a conspiracy existed, understood the essential nature of the conspiracy plan, and sought to make the plan succeed, the defendant would be guilty of aiding and abetting a conspiracy. *Id.; see also Galiffa*, 734 F.2d at 311 (emphasizing that a defen-

dant must have knowledge of the conspiracy).

Brown argues that in Minnesota we should not recognize the offense of aiding and abetting a conspiracy because if a person aids a conspiracy, the person is necessarily part of the conspiracy and if a person aids a crime, without being aware of the conspiracy, the person has aided the crime and not the conspiracy. We need not, and do not, decide whether aiding and abetting a conspiracy is a viable charge in Minnesota because even if it were a viable charge, the state failed to present sufficient evidence to support Brown's conviction. The state concedes that if we were to recognize the charge of aiding and abetting a conspiracy, the state would have to prove, as an element of the offense, that Brown knew of the conspiracy.

■ While we are not convinced that the state has proven the existence of a conspiracy, we turn first to the dispositive question of whether the state has proven that Brown knew of a conspiracy. A criminal conspiracy is (1) an agreement between two or more people to commit a crime, and (2) an overt act in furtherance of the conspiracy. *State v. Stewart*, 643 N.W.2d 281, 297 (Minn.2002). At trial, the state argued that Slack conspired with the CRI to buy drugs, and that Brown aided and abetted the conspiracy by selling drugs to Slack. The court of appeals concluded that there was sufficient evidence to find that Slack conspired with Esquivel and that Brown aided and abetted the conspiracy by allowing them to use his apartment to conduct the sales.[1] *Brown*, 2006 WL 2052962, at *7–8. We find no

1. The court of appeals concluded that the CRI could not be a party to the conspiracy because law enforcement acting in their official capacity cannot be a party to a conspiracy as they lack the requisite intent to commit the substantive crime. *Brown*, 2006 WL 2052962, at *7 (citing 2 Wayne R. LaFave,

*Substantive Criminal Law* § 12.2(a), (2d ed.2003)). However, our decision in *State v. St. Christopher* indicates that under Minnesota's conspiracy statute, it is possible for an individual who lacks the intent to commit the substantive crime to be a party to the conspiracy. 305 Minn. 226, 228, 234–35, 232

direct or circumstantial evidence that Brown knew of a conspiracy under either theory. We find no evidence, direct or circumstantial, that Brown was aware of Slack and the CRI's agreement to buy the drugs. The frequency of sales and total amount of cocaine, 3.2 grams, fail to establish that Slack had conspired with a third party to buy drugs. Since there is no evidence that Brown had knowledge of a conspiracy between Slack and the CRI, he cannot be guilty of aiding and abetting such a conspiracy.

Likewise, there is no evidence that Brown knew of a conspiracy between Slack and Esquivel to sell cocaine to a third party. Even if the state proved that Esquivel was selling drugs to Slack and Brown knew it, such proof does not establish knowledge of a conspiracy between Esquivel and Slack because a simple agreement between a seller and a buyer of controlled substances cannot support a conspiracy charge. *See State v. Pinkerton*, 628 N.W.2d 159, 164 (Minn.App.2001). And there is no evidence that Slack and Esquivel agreed to the sale of cocaine to a third party, the CRI, much less evidence that Brown knew of such an agreement. On this record, we are simply left to speculate as to the nature of Slack's conversations or understanding with either Brown or Esquivel. Since we find no evidence that Brown knew of a conspiracy, we conclude that the evidence is insufficient to find Brown guilty of aiding and abetting a conspiracy. We reverse the court of appeals decision and vacate Brown's conviction.

## II.

Because we have vacated Brown's conviction for insufficient evidence, we need not consider Brown's additional claim that he is entitled to a new trial because a racially biased juror was allowed to sit on the jury. We are mindful, however, of our obligation to uphold the integrity of the judicial system and we are extremely troubled by the fact that a juror who was plainly biased against members of Brown's race was allowed to sit on the jury that found Brown guilty. During voir dire, a juror admitted that he was racially biased, that he did not trust black people, and that his daughter was dating a black man and he would not allow the man in his home. The juror also stated that he thought he could be fair to the defendant even though the defendant is black. Brown's attorney did not challenge the juror for cause, nor exercise a peremptory challenge against the juror, and the juror sat on the jury that found Brown guilty. The state concedes on appeal that the juror's statements establish an actual and an implied bias.[2]

The Sixth Amendment requires that in all criminal prosecutions, the ac-

N.W.2d 798, 799–800, 803 (1975). While we need not decide the issue here, we do note that this court has never extended the holding of *St. Christopher* to a situation such as this where law enforcement initiated the conspiracy.

**2.** An actual bias is a state of mind on the part of the juror, in reference to the case or to either party, which would prevent the juror from trying the issue impartially and without prejudice to the substantial rights of either party. *See United States v. Torres*, 128 F.3d 38, 43 (2d Cir.1997); *United States v. Haynes*, 398 F.2d 980, 984 (2d Cir.1968). A juror who has an actual bias is generally subject to rehabilitation, and may sit on the jury if he or she agrees to set aside any preconceived notions and make a decision based on the evidence and the court's instructions. *See People v. Lefebre*, 5 P.3d 295, 301 (Colo.2000).

An implied bias, on the other hand, is a bias that is conclusively presumed as a matter of law. *United States v. Wood*, 299 U.S. 123, 133, 57 S.Ct. 177, 81 L.Ed. 78 (1936). A juror who is found to have an implied bias is not susceptible to rehabilitation through further questioning. *Lefebre*, 5 P.3d at 300. "[C]ourts have been inclined to presume bias in 'extreme' situations where the prospective

cused shall enjoy the right to a speedy and public trial, by an impartial jury. U.S. Const. amend. VI; *United States v. Wood,* 299 U.S. 123, 133, 57 S.Ct. 177, 81 L.Ed. 78 (1936). The impartiality of the adjudicator goes to the very integrity of the legal system. *Gray v. Mississippi,* 481 U.S. 648, 668, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987). The bias of a single juror violates the defendant's right to a fair trial. *Dyer v. Calderon,* 151 F.3d 970, 973 (9th Cir.1998). We have held that the presence of a biased judge acting as fact finder constitutes structural error. *State v. Dorsey,* 701 N.W.2d 238, 252–53 (Minn. 2005).

■ Structural errors require automatic reversal because such errors "call into question the very accuracy and reliability of the trial process." *State v. Osborne,* 715 N.W.2d 436, 448 n. 8 (Minn. 2006) (quoting *McGurk v. Stenberg,* 163 F.3d 470, 474 (8th Cir.1998)). Structural errors always invalidate a conviction whether or not a timely objection to the error was made. *See Sullivan v. Louisiana,* 508 U.S. 275, 276–82, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993).

Since we have vacated Brown's conviction, we do not address Brown's claim that he is entitled to a new trial because a biased juror was allowed to sit on the jury.

Reversed.

juror is connected to the litigation at issue in such a way that is highly unlikely that he or she could act impartially during deliberations." *Hunley v. Godinez,* 975 F.2d 316, 319 (7th Cir.1992). Although racial bias generally falls within the category of actual bias and is generally subject to rehabilitation, *see* 5 Wayne R. LaFave, Jerold H. Israel & Nancy J. King, *Criminal Procedure* § 22.3(c), at 307–08 (2d ed.1999), there may be cases in which a juror's admitted racial bias is so strong that,

like implied bias, it is not subject to rehabilitation. *See Gamble v. Commonwealth,* 68 S.W.3d 367, 373 (Ky.2002) (holding that juror could not be rehabilitated where he had stated that he was racially biased, that he had left his neighborhood because young black men were hanging around in the area, that when he walked into the courtroom he had assumed that the defendant was the accused based on the color of his skin, and that he was offended by interracial relationships).