STATE of Minnesota, Respondent,

v.

Grant Benjamin EVERSON, Appellant.

No. A07–752.

Supreme Court of Minnesota.

May 29, 2008.

Peter A.C. Ivy, Carver County Justice Center, Chaska, MN, Attorney General, St. Paul, MN, for Respondent.

Steven P. Russett, Assistant State Public Defender, St. Paul, MN, for Appellant.

## OPINION

GILDEA, Justice.

Appellant Grant Benjamin Everson was convicted of aiding the first-degree premeditated murder of his mother and sentenced to life in prison. On direct appeal, he argues that the district court erred in allowing the jury to review recorded witness statements after it had begun deliberations. He also contends that the district court committed reversible error by allowing two nonjurors to be present with the jury while it reviewed this evidence. We affirm.

This action arises from the shooting death of appellant's mother, Nancy Everson. The evidence during trial established that appellant, Grant Benjamin Everson (Everson) lived with his parents, Nancy and Thomas Everson, in Chaska, Minnesota at the time of the shooting. Everson attended Hennepin Technical College, but he was failing his classes. He was not employed and spent a great deal of time with his friends, Joel Beckrich and Christopher Fuhrman, at Beckrich and Fuhrman's apartment in Burnsville.

The day before the shooting, Friday, January 13, 2006, Everson told Beckrich and Fuhrman that he wanted to kill his parents. The next day, Nancy and Thomas Everson discussed with Everson and his girlfriend his failing performance at school and his conduct generally. After that discussion, Nancy Everson found her husband's pistol hidden under a hat. Everson denied knowing how it got there. Thomas Everson hid the pistol in his bedroom closet. At about 10:30 p.m., Everson left the house to take his girlfriend home.

Everson arrived at Beckrich's apartment with a shotgun case at approximately 11:45 the same night. Everson, Beckrich, and Fuhrman went upstairs, where Everson showed his friends the shotgun and they discussed how Everson and Beckrich would kill Everson's parents. Everson and Beckrich decided to slit Nancy and Tom Everson's throats with box cutters, and to use the shotgun if anything went wrong. Everson said that he was a beneficiary of his mother's life insurance policy, and he agreed to give half the proceeds of that and anything else he obtained upon his parents' death to Beckrich, who planned to move to Amsterdam to open a coffee/marijuana shop. Everson and Beckrich left the apartment at 2:30 a.m. on Sunday, dressed in two layers of clothing, carrying box cutters and the shotgun. They planned to dispose of the outer layer of clothing after the murders, in case there were any identifiable traces of the victims on the clothing. Both wore gloves, and they wiped down the shotgun before departing.

Everson and Beckrich parked some distance from the Everson home, walked to the house, and entered through the garage on the lower level. They used duct tape to seal their clothing around their wrists and ankles, and went upstairs to the mudroom where they put on ski masks. They entered the master bedroom, but stopped immediately when Nancy Everson moved in her bed. They stayed there, frozen, for a few minutes, and then backed out of the room and returned to the mudroom. They talked about not being able to go through with their plan. Then Everson apparently heard a noise, and he pointed the gun into the hallway and removed the safety. A light came on, and Nancy Everson came down the hall toward Everson, who pointed the gun at her and told her to sit down. She asked if they could talk, and when

Everson did not respond, she went into the kitchen.

Everson told Beckrich to shoot her, because Everson could not, and the two went back and forth a few times about who would do it, with each insisting he could not. Then Everson pushed the gun into Beckrich's hands; Beckrich took it and began walking down the hall toward the master bedroom. Nancy Everson went back into the hallway, and Everson told Beckrich to turn around because she was behind him. At this point, Beckrich and Nancy Everson were both in the hallway between the kitchen and the master bedroom. The gun safety was still off, and Beckrich held the gun pointed down. Beckrich said to Nancy Everson "head or chest." She did not respond, and he asked again. She took a step towards Beckrich, and he raised the gun and aimed it above her head. She yelled at her son to get out of the house, and started to walk toward Beckrich. Beckrich fired a warning shot over her head. When she lunged at him, Beckrich fired a second shot at her head, and she fell over.

Beckrich went back to the Eversons' bedroom, to find Tom Everson. He looked briefly in the room, saw no one, and then fled down the hall and out the garage. He and Everson met on the way back to their vehicle, and Beckrich discarded the gun. They also disposed of some of their clothing and the gun case.

Beckrich and Everson arrived back at Beckrich's apartment at about 5:30 a.m., and told Fuhrman and another friend what had happened. They agreed on an alibi, that all had spent the night in the apartment. Everson left at about 7:00 a.m., intending to go home, and on the way he called Beckrich to discuss the alibi further.

Everson was arrested before he arrived home.

At about 5:00 p.m. the same day, investigators went to Beckrich's apartment to talk to Everson's friends. Fuhrman told the investigators that Beckrich had shot Nancy Everson, after which Beckrich confessed. Beckrich's conversation at his home with an investigator was recorded on audiotape and a transcript was made. In addition, Beckrich and Fuhrman gave statements that were recorded on videotape at the police station that night.

Everson was indicted on four counts: aiding the attempted first-degree premeditated murder of his father; aiding the attempted first-degree premeditated murder of his mother; aiding the first-degree premeditated murder of his mother; and aiding the second-degree murder of his mother. His jury trial was held in November 2006.

Beckrich and Fuhrman, who had reached plea agreements with the State, testified at Everson's trial. Their recorded statements were played for the jury during their testimony, and the tapes were entered into evidence as exhibits without objection.[1] Beckrich was also questioned about his audiotaped statement to investigators at his home. In that statement, he indicated that he shot Nancy Everson because he "would be free if she didn't live." Beckrich also told police that he did not intend to kill anyone and was only trying to warn Nancy Everson to stay away from him. On cross-examination Beckrich confirmed that he did not intend to kill Nancy, and when defense counsel asked if he fired "instinctually" when she lunged at him, Beckrich agreed.

---

1. The video portion of Beckrich's statement could not be played for technical reasons but the jury heard the audio portion. Likewise, when the jury reviewed the statement after retiring to deliberate, the video portion was not shown but the audio was played.

The defense theory was that Everson was guilty only of aiding the attempted first-degree murder of his parents. Defense counsel argued that Everson and Beckrich abandoned their plan to murder Everson's parents after leaving the bedroom. Counsel further argued that Nancy Everson's death was the result of a "rash and indiscriminate" act committed by Beckrich, and that Everson therefore was not guilty of aiding a premeditated, intentional murder. Everson did not testify.

The afternoon of the first day of deliberations, the jurors asked for equipment to replay three recorded statements that had been admitted into evidence and sent to the jury room: an audio recording of Everson made in the squad car after Everson's arrest, and the recordings of Fuhrman's and Beckrich's statements, made the night of their arrests. Defense counsel objected to allowing review of the statements, on the grounds that it would give undue weight to the recorded statements, over and above trial testimony. The court determined that the jury could review the recordings, but that the review would take place in the courtroom. At the request of defense counsel, the court decided that the recordings would be listened to in their entirety and only once.

Both parties also agreed that a court reporter did not need to be present during the jury's review of the statements and that the jury's review of the evidence was "a private proceeding." Counsel for both sides stated their intention to be present during the jury's review of the evidence. Because the recordings comprised almost three hours of evidence and it was already late in the day, the court gave the jury the option of reviewing the evidence that evening after the jury returned from dinner or the next morning. The jury chose to review the evidence in the morning, and the court then advised counsel that it had to handle another calendar that morning and so would not be able to be present during the jury's review. The parties agreed that the judge did not need to be present for the review and that the court's clerk, would be in the courtroom.

The next morning, counsel informed the court that they had decided that counsel should not be present for the jury's review of the evidence, and the court agreed that that "would be best." The record reflects that the parties agreed that Chris Weldon, an employee in the county attorney's office, would "be doing the technical part of playing the recordings." [2] Mr. Weldon was instructed that he was not to make any comments to the jury, not to answer any questions from the jury, and to play the recordings only once.

Regarding Everson's presence, defense counsel noted specifically that they "had some specific concerns about [Everson] being in [the courtroom] for such a long period of time while the tapes are playing." Everson agreed on the record that he waived his right to be present.

Before replaying the exhibits for the jury, the court, in the presence of counsel and Everson, gave detailed instructions to the jury regarding the agreed upon review procedure described above. The jury was also told that they did not have to review all three of the recorded statements, but that once a statement had begun being played, the jury would need to listen to the entire statement. [3] The court minutes re-

2. Apparently the only equipment available for playing the exhibits was the prosecutor's laptop. Because the computer contained other information, someone had to be present with the jury to play the exhibits on the laptop.

3. Specifically, the court instructed the jury:
 [T]here are some groundrules that the Court, after consultation with the attorneys, will make regarding your listening to these exhibits. First of all, the attorneys and Mr.

flect that the jury reviewed all three statements.

Approximately one hour after completing their review of the recordings, the jury returned guilty verdicts on all four counts. The jury further found, as aggravating factors, that Everson was the "ring leader or master mind" of the plan, and that he had "violated a position of trust" to enter the victims' home. The court denied Everson's motions for a judgment of acquittal and for a new trial, convicted Everson on all four counts, and sentenced him, on the conviction for aiding first-degree premeditated murder, to life in prison without the possibility of release. This direct appeal followed.

## I.

■ We turn first to Everson's argument that the district court abused its discretion in allowing the jury to review the three recorded statements during its deliberations. The decision to grant a jury's request to review evidence is within the discretion of the district court, and we will not overturn it absent an abuse of that discretion. *State v. Reed,* 737 N.W.2d 572, 586 (Minn.2007).

■ When it retired to begin deliberations, the jury was given the three recorded statements as exhibits 45, 47 and 64. But the jury was not given any equipment to play the recordings. During deliberations, the jury submitted a note to the court asking for the equipment required for the playing of these three exhibits. When a jury makes a request such as this, the court "should" consider three factors:

(i) whether the material will aid the jury in proper consideration of the case;

(ii) whether any party will be unduly prejudiced by submission of the material; and

(iii) whether the material may be subjected to improper use by the jury.

*State v. Kraushaar,* 470 N.W.2d 509, 515 (Minn.1991); *see also* Minn. R.Crim. P.

Everson will not be present. This is your deliberation and [your] deliberations should be secret and up to you. So we will all be leaving the courtroom including myself and my reporter. Mr. Chris Weldon from the County Attorney's office will be playing the recordings for you. He has been instructed that he is not to communicate to you in any way. He's not to make any comment if either Mr. Weldon or the clerk can advise you as to which exhibit you are about to hear, but that is all that they should say to you. If you make any statements during the time that Mr. Weldon is present, he's instructed specifically not to make any comment to any of the attorneys or parties regarding any statements that you may make during your listening. You have asked me if you can take notes and you can certainly take notes during the time that you listen to these recordings.

Once a recording is started, you are required to listen to the entire recording, and Mr. Weldon has been instructed not to stop and replay portions, but it can be played start to finish. Once you have listened to any recording that you wish to listen to, you can choose to listen to the other recordings. I believe you've asked about three recordings, but you don't need to listen to all of them. You can listen to whichever ones you choose to listen to, but once you start a recording you need to listen to all of that recording, but you can then choose as to what other recordings you wish to listen to. You will be able to listen to various recordings at this time, however this will be the last opportunity for you to listen to these recordings. The transcripts that were given to you during the trial will be given to you again to assist you in listening to the recordings. They will give you the transcript for the particular recording that you're listening to and at the end of playing that recording, they will collect that transcript and if you wish to listen to another, then that transcript will be given to you.

At the end of these instructions, the court asked counsel whether they requested additional instructions be given and neither side did.

26.03, subd. 19(2) 1 and 2 (setting forth appropriate procedures to address a jury's request to review evidence and indicating that trial court has discretion to provide the jury with other relevant evidence).

The parties do not contend that the first and third factors are at issue, but Everson argues that the court erred because it did not consider the second factor and assess the potential for undue prejudice. Even though Everson did not object to the admission of the recorded statements into evidence as exhibits, Everson argued that the court should not allow the jury to hear the statements again during its deliberations. Specifically Everson contends the replaying of Beckrich's statement was unduly prejudicial because it tended, more than Beckrich's trial testimony, to show that the premeditated plan was not abandoned. In the recorded statement, Beckrich said he shot the victim to "get off without any repercussions" and that he asked "head or chest" because he "would rather they choose whichever they would prefer." But when cross-examined at trial, Beckrich explained that at the time of the shooting he no longer intended to kill Nancy Everson, was stalling for time in asking "head or chest," and acted "impulsively" and "instinctually" when she lunged at him. The State characterized this portion of Beckrich's trial testimony as "recast[ing] what happened." The defense encouraged the jury to view Beckrich's explanation on cross-examination as truthful, and to discount his videotaped statement.

In response to Everson's objection, the court said that it was

conflicted in that the jury only gets to hear the testimony of witnesses once, however these exhibits were admitted in evidence, they did go back to the jury room. Obviously they can't glean anything from a CD or a DVD, but quite frankly, it appears to me that the intent of the parties, knowingly or unknowingly, was that these were exhibits to be used by the jury and now that we've sent them back there I think they have the right to listen to them. So I intend to respond to the question * * * that the jury may listen to these audio or video recordings.

The court's on-the-record analysis does not reflect that the court explicitly considered whether Everson would be "unduly prejudiced" by the jury's hearing of Beckrich's recorded statement a second time, or whether the court considered the other two factors referenced in *Kraushaar*. *See* 470 N.W.2d at 515. Absence of this analysis from the record makes appellate review difficult. *Cf. State v. Haynes*, 725 N.W.2d 524, 528 (Minn.2007) (reviewing district court's analysis and holding that court did not abuse its discretion in allowing jury to re-examine requested statements).

Even if the district court erred here, however, that error would be subject to harmless error analysis. *Kraushaar*, 470 N.W.2d at 516. In *Kraushaar* we held that the error was harmless, in part, because replaying the tape merely "allowed the jury to rehear what it had already heard," the videotape was consistent with and corroborated by other evidence in the trial, and it was extremely unlikely that replaying the tape prompted "the jury to convict where it otherwise would not have done so." *Id.* We reach the same conclusion in this case.

The jury, in reviewing the recorded statements in their entirety one additional time, was simply rehearing what it had already heard in the same place it had already heard the evidence. The substance of the statements was consistent with other evidence in the trial. For example, in their trial testimony, Fuhrman and Beckrich gave testimony indicating

that the murder of Nancy Everson was premeditated. Both Fuhrman and Beckrich testified to a conversation on January 13, 2006, about Everson's desire to kill his parents. Both testified to Everson's making plans with Beckrich on the night of the murder to use box cutters, to use a shotgun as a backup, and to avoid leaving any traces. Both testified regarding plans to use the money to move to Amsterdam. And, specifically with respect to Beckrich, his testimony on direct examination was consistent with the story he related to police in the recorded statement. The jury was also reminded of the defense's theory that the killing was not intentional because in his taped statement Beckrich told the police that he did not intend to kill anyone that night and that he had shot Nancy Everson "instinctively [or] instinctually" when she lunged at him.

Finally, there is no reasonable possibility that the jury's rehearing of these statements caused it to convict "where it otherwise would not have done so." *Id.* There was strong evidence from which the jury could infer that the premeditated plan to kill Everson's parents was never abandoned: Everson and Beckrich did not leave the house immediately; Everson released the safety on the shotgun; Everson held the gun ready to shoot when his mother came out of the master bedroom; Everson pressed Beckrich to carry out the shooting; when Everson pushed the gun into his hands, Beckrich held it and went toward the master bedroom; Beckrich asked Nancy Everson whether she preferred a shot in the head or in the chest; Beckrich aimed at and shot Nancy in the head; and Beckrich returned to the master bedroom to shoot Tom Everson before fleeing the house. Given all of this evidence, it is "extremely unlikely" that review of the statements caused the jury "to convict where it otherwise would not have done so." *Id.* at 516. For all of these

reasons, we hold that any error in allowing the jury to review the statements was harmless.

## II.

■ We turn next to Everson's argument that he is entitled to a new trial because of the procedure used for the jury's review of the three taped statements. The district court did not instruct the jury to suspend its deliberations before the review of the statements began, and, with Everson's agreement, allowed a court clerk and an employee of the county attorney's office to stay in the courtroom with the jury while it reviewed the statements. Everson points to the court's instruction to the jury that the review of the statements was part of the jury's secret deliberation, and argues that the presence of two nonjury members with the deliberating jury was structural error that deprived him of his due process right to a fair and impartial jury. As such, Everson argues his conviction must be reversed and a new trial awarded.

■ Errors that are structural "require automatic reversal because such errors 'call into question the very accuracy and reliability of the trial process.'" *State v. Brown,* 732 N.W.2d 625, 630 (Minn.2007) (quoting *State v. Osborne,* 715 N.W.2d 436, 448 n. 8 (Minn.2006)); *see also Arizona v. Fulminante,* 499 U.S. 279, 309–10, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (indicating that "structural defects in the constitution of the trial mechanism * * * defy analysis by 'harmless error' standards"); *McGurk v. Stenberg,* 163 F.3d 470, 474 (8th Cir.1998) (explaining that structural errors, "on the other hand, call into question the very accuracy and reliability of the trial process and thus are not amenable to harmless error analysis, but require automatic reversal"). These "errors always

invalidate a conviction whether or not a timely objection to the error was made." *Brown,* 732 N.W.2d at 630 (citing *Sullivan v. Louisiana,* 508 U.S. 275, 276–82, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993)).

Although we did not use the phrase "structural error," we have held that a judge's uninvited entry into the jury room during deliberations and in the absence of defendant and counsel requires automatic reversal because it "offends the integrity of the proceedings and risks influencing the jury's decisional process in some degree, however difficult to define or impossible to measure." *State v. Mims,* 306 Minn. 159, 169, 235 N.W.2d 381, 389 (1975). We reached a similar conclusion in *Brown v. State,* 682 N.W.2d 162, 167–68 (2004).[4]

Relying on *Mims* and *Brown* (2004), Everson argues that the procedure used to allow the jury to view the taped statements a second time intruded on the sanctity of the jury room and therefore constituted structural error, which requires automatic reversal. We disagree.

In formulating the rule in *Mims* and in adhering to it in *Brown* (2004), we relied on the particular role of the judge: "the trial judge's position in performing his role and function before submission of the case is a powerful one and makes him an imposing figure in the minds of the jurors. * * * [T]he average juror is very sensitive to any hint or suggestion by the judge." *Mims,* 306 Minn. at 168, 235 N.W.2d at 387. When this "imposing figure" intrudes into the jury's deliberative process, *id.* at 168, 235 N.W.2d at 387, "there is a significant interference with the orderly decisional process, and prejudice to the process results by the implication that the judge has the prerogative of entering the jury room and there exercising the same domi-

nant authority he possesses in the courtroom." *Id.* at 169, 235 N.W.2d at 388. The concern when the judge intrudes is that he or she can exert a "controlling influence," and for this reason "a communication by the judge to the jury stands on a different basis from that of another person, and for a like reason the law should throw a higher degree of circumspection around such communications." *Id.* at 166, 235 N.W.2d at 386 (quoting *Danes v. Pearson,* 6 Ind.App. 465, 33 N.E. 976, 978 (1893)).

Unlike *Mims* and *Brown* (2004), the judge did not intrude on this jury or on the sanctity of the jury room. The two persons present with the jury during review of the statements, a court clerk and a nonlawyer employee of the county attorney's office, had no authority over the proceedings, much less "dominant authority" in the courtroom. *Brown,* 682 N.W.2d at 168. They stand "on a different basis" from a judge. *Mims,* 306 Minn. at 166, 235 N.W.2d at 386. Moreover, their presence was limited to a period during which the jury was reviewing evidence in the courtroom. We conclude that the procedure used here, while perhaps inadvisable, is not comparable to an uninvited entry by the judge into the jury room. We therefore hold that structural error was not committed and automatic reversal is not warranted.

 But the conclusion that structural error has not occurred does not end the analysis. We must still determine whether we should review any error in the procedures for plain error. As discussed above, Everson agreed to the procedures the court used in this case, and under the invited error doctrine, a party cannot as-

---

**4.** To distinguish this case from *State v. Brown,* 732 N.W.2d 625 (Minn.2007), cited earlier, we will refer to this case as *Brown* (2004).

sert on appeal an error that he invited or that could have been prevented in the district court. *State v. Goelz*, 743 N.W.2d 249, 258 (Minn.2007). The invited error doctrine does not apply, however, if an error meets all four parts of the plain error test. *Id.* The plain error rule gives this court discretion to review unobjected-to errors if (1) there is error, (2) the error is plain, and (3) the error affects substantial rights. *Id.* If the defendant establishes all three factors, we then consider a fourth: "whether the error should be addressed to ensure fairness and the integrity of the judicial proceedings." *Id.* (quoting *State v. Reed*, 737 N.W.2d 572, 583 (Minn.2007)).

In this case, we need go no further than the third factor. Everson makes no argument regarding plain error and substantial rights, but asserts that the purported error "strikes at the very heart of juror independence and the integrity of the decisional process." This assertion, without even any allegation of misconduct on the part of the nonjurors or the jurors, much less any evidence of the same, is not sufficient for Everson to prove that his substantial rights were affected. Moreover, as noted above, the evidence of Everson's guilt was strong and the procedure at issue simply allowed the jury to rehear evidence it had already heard. We hold that Everson has not met his burden to show that the procedure constituted plain error. Consequently, the invited error doctrine prohibits further review.

### III.

As an alternative to his request for a new trial based on the procedures used for the jury's review of the recorded statements, Everson requests a *Schwartz* hearing to create a record of any communications that may have occurred between the jury and the nonjurors. In

*Schwartz v. Minneapolis Suburban Bus Co.*, 258 Minn. 325, 104 N.W.2d 301 (1960), we crafted a procedure for inquiring into jury conduct that may have prevented a fair trial. *Id.* at 328, 104 N.W.2d at 303. To avoid the harassment of jurors by a defeated litigant, the matter is to be brought to the attention of the trial court, which may permit an examination of the jurors on the record in the presence of counsel. *Id.* at 328, 104 N.W.2d at 303. A defendant may move for a *Schwartz* hearing under Minn. R.Crim. P. 26.03, subd. 19(6), and to obtain a *Schwartz* hearing, the defense has the "burden of adducing 'sufficient evidence which, standing alone and unchallenged, would warrant the conclusion of jury misconduct.'" *See Opsahl v. State*, 677 N.W.2d 414, 422 (Minn.2004) (quoting *State v. Church*, 577 N.W.2d 715, 720 (Minn.1998)); *State v. Larson*, 281 N.W.2d 481, 484 (Minn.1979).

Everson did not request a *Schwartz* hearing in the district court. Our review is normally limited to consideration of the issues presented to or decided by the district court. Minn. R. Civ.App. P. 103.04; *Watson v. United Servs. Auto. Ass'n*, 566 N.W.2d 683, 687 (Minn.1997). In addition, Everson has not made the required showing of evidence which, if unchallenged, would warrant a conclusion of jury misconduct. The record, which consists only of notes kept by the clerk who was present while the jury reviewed the three taped statements, indicates simply that the judge and attorneys left the courtroom, that two exhibits were played, followed by a 15–minute break, the beginning of a third exhibit, a 27–minute recess, and the conclusion of the third exhibit. There is no indication that the nonjurors, whose presence was agreed to by the defense, intruded upon the jury's decision-making or communicated with the jury in any way beyond the process to which Everson and his counsel agreed. Accordingly, we hold

that Everson has not met his burden to show that he is entitled to a *Schwartz* hearing.

Affirmed.

Concurring in part, dissenting in part, ANDERSON, PAUL H., J. Dissenting, MEYER and PAGE, JJ.

ANDERSON, PAUL H. Justice (concurring in part and dissenting in part).

I concur in part and respectfully dissent in part. I agree with the majority that any error in allowing the jury to review the recorded witness statements that had been admitted into evidence was harmless. I also agree the procedural error in how the jury was permitted to review the evidence in the presence of an employee of the county attorney was not structural error and that this error can be reviewed under the plain error doctrine. But, I do not agree with the majority that on the information before us, we can conclude that there was no plain error. Further, while I agree with many of the concerns expressed by Justice Meyer in her dissent, I do not agree that on the record before us, we must grant a reversal. Rather, I would remand to the district court for a *Schwartz* hearing in order to create a proper record of any communications that may have occurred between the jury and the employee of the county attorney's office who played the recordings for the jury. *Schwartz v. Minneapolis Suburban Bus Co.*, 258 Minn. 325, 328, 104 N.W.2d 301, 303 (1960). I conclude that such a record is necessary for us to determine whether we can affirm Everson's conviction or whether we must reverse and remand for a new trial.

MEYER, Justice (dissenting).

I respectfully dissent. The majority today dilutes this court's strict rule that an intrusion upon jury deliberations by an officer of the court is not subject to harmless error analysis. I would reaffirm our strict rule and hold that the presence of a representative from the county attorney's office and a court clerk during secret jury deliberations is a defect in the trial proceedings that requires reversal.

Structural errors require automatic reversal, whether or not an objection was made, because they "call into question the very accuracy and reliability of the trial process." *State v. Brown*, 732 N.W.2d 625, 630 (Minn.2007) (citing *State v. Osborne*, 715 N.W.2d 436, 448 n. 8 (Minn.2006)). Structural error affects the "framework within which the trial proceeds," rather than being simply an "error in the trial process itself." *Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (Rehnquist, J., writing for the Court in part). Although we did not call it "structural error," this court in *State v. Mims*, 306 Minn. 159, 235 N.W.2d 381 (1975), reversed a conviction when the judge made an uninvited entry into the jury room. *Id.* at 171, 235 N.W.2d at 389. The question of a new trial did not turn on whether the judge's entry into the jury room was prejudicial to the defendant. Rather we reversed for a new trial based on the effect of the intrusion "upon the integrity of the proceedings and the independent role and function of a jury during its deliberations on its verdict." *Id.* at 163, 235 N.W.2d at 384.

The majority, in an effort to distinguish this case from *Mims* by calling attention to the fact that the judge did not intrude on this jury, fails to consider that the intrusion of an employee of the county attorney's office is potentially more egregious than that of a judge. Whereas the judge is neutral, the prosecutor's office most certainly is not. The New York Court of Appeals, in distinguishing the presence in

the jury room of a sign language interpreter from that of a court employee, said that

[c]ertain outsiders, such as a bailiff or other court official, may inhibit or influence the jury by their mere presence. They may be perceived as having pertinent legal knowledge or as being aligned with the law enforcement community. In either case, their presence could have an adverse impact on the deliberations.

*People v. Guzman,* 76 N.Y.2d 1, 556 N.Y.S.2d 7, 555 N.E.2d 259, 263 (1990). Regardless of the specifics of Weldon's conduct while he played the recordings for the deliberating jury, his very presence created the potential for prosecutorial influence on the jury's decision-making. Weldon's alignment with the law enforcement community was more than a mere perception; it was a fact known by the jury for whom he played the recordings. His presence with the deliberating jury, even though he is not a judge, is precisely the kind of error that "call[s] into question the very accuracy and reliability of the trial process." *See Brown,* 732 N.W.2d at 630 (quoting *Osborne,* 715 N.W.2d at 448 n. 8).

Even a bailiff, as an officer of the court, is an official whose status has the potential to influence a jury. The United States Supreme Court has concluded that a bailiff's comments about a defendant's case to jury members, even when a majority of jurors did not hear the comments, violated the defendant's Sixth Amendment rights to an impartial jury and to be confronted with the witnesses against him. *Parker v. Gladden,* 385 U.S. 363, 365–66, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966). The Court cautioned that "the official character of the bailiff—as an officer of the court as well as the State—beyond question carries great weight with a jury which he had been shepherding for eight days and nights." 385 U.S. at 365, 87 S.Ct. 468.

I am also deeply concerned by the majority's willingness to blur the lines between jury deliberations, which must be secret, and trial proceedings, which must be open to the public and in the presence of counsel and the defendant. It is undeniable that the jury was in deliberations while Weldon, an employee of the county attorney's office, was present. The judge gave the following instructions regarding the playing of the statements:

First of all, the attorneys and Mr. Everson will not be present. *This is your deliberation and your deliberations should be secret and up to you.* So we will all be leaving the courtroom including myself and my reporter. Mr. Chris Weldon from the County Attorney's Office will be playing the recordings for you. He has been instructed that he is not to communicate to you in any way. He's not to make any comment if either Mr. Weldon or the clerk can advise you as to which exhibit you are about to hear, but that is all that they should say to you. *If you make any statements during the time that Mr. Weldon is present,* he's instructed specifically not to make any comment to any of the attorneys or parties regarding any statements that you may make during your listening.

\* \* \* \*

Ladies and gentlemen of the jury, it will take us a couple of minutes to get all of this set up. I'll ask that the bailiff take you back to the jury room for just a couple of minutes. While we do that, you can continue your deliberations and the bailiff will bring you back into the courtroom when they're ready to start the playing of the recordings.

(Emphasis added.) Not only did the trial judge remind the jury that these were secret deliberations, but he also indicated that they could talk freely in front of Wel-

don, who had been instructed not to comment on anything the jury said. The proceeding was not open to the public. The courtroom where the jury was deliberating, and where judge, counsel, and defendant were all absent, was the functional equivalent of a jury room.

More than once we have affirmed the secrecy of jury deliberations in no uncertain terms: "It has always been deemed essential to the integrity and efficiency of the jury system, that the jurors should retire and consult together in secret, * * * and that they should be permitted to conduct their deliberations in their own way free from any outside control or interference." *Weber v. Stokely–Van Camp, Inc.,* 274 Minn. 482, 493, 144 N.W.2d 540, 546 (1966) (quoting *Hurlburt v. Leachman,* 126 Minn. 180, 183, 148 N.W. 51, 52 (1914)). Here, the courtroom was transformed into a jury room by the judge's instructions that the jury was free to continue its deliberations in the courtroom. The majority finds that the presence of nonjurors was "limited to a period during which the jury was reviewing evidence in the courtroom," and thus avoids recognizing that these were secret jury deliberations. I cannot find in the "limited" nature of the nonjurors' presence justification for the violation of the sanctity of the jury room.

Nor can I find justification for closing the proceeding. The majority offers none. In reaffirming our "strict rule" in *Mims,* we said that "[i]t is fundamental that *all proceedings* in the trial of a criminal case shall be open and public and shall be conducted in the presence of defendant and counsel." 306 Minn. at 167, 235 N.W.2d at 387 (emphasis added). A defendant has a constitutional right to a public trial, and though that right may give way when there is an "overriding interest that is likely to be prejudiced," the court must consider alternatives to closure, make findings supporting the closure, and allow a closure limited to what is necessary to protect the interest. *State v. Mahkuk,* 736 N.W.2d 675, 684–85 (Minn.2007) (quoting *Waller v. Georgia,* 467 U.S. 39, 46, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984)). None of these requirements have been met in this case. Thus the majority creates, without pointing to any authority for doing so, a nebulous third category of proceedings, where the jury is deliberating but the presence of an employee of the prosecutor's office poses no problem. Under this court's precedent, the jury's deliberations should have been suspended and the recordings should have been replayed in open court, in the presence of the judge, counsel, and the defendant.

The record in *Mims* suggested that the trial judge intruded upon the jury deliberations because he was trying to avoid inconveniencing court personnel. *Mims,* 306 Minn. at 163 n. 1, 235 N.W.2d at 384 n. 1. Similarly, the record in this case suggests that the trial judge and counsel developed the erroneous procedure to avoid inconveniencing the judge and the jury. I do not question the intentions or motives of the court and counsel in settling upon this procedure, but I am unwilling in the name of convenience and judicial efficiency to close my eyes to a procedure that "risks influencing the jury's decisional process in some degree, however difficult to define or impossible to measure." *See id.* at 169, 235 N.W.2d at 388.

There is no need for an employee of the prosecutor's office or a court clerk to have contact with the jury, outside that occurring in open court. I would reaffirm our strict rule from *Mims* by holding that the presence of these two nonjurors with the deliberating jury for a period of nearly three hours was structural error necessitating a new trial.

PAGE, Justice (dissenting).

I join in the dissent of Justice Meyer.

PAGE, Justice (dissenting).

I respectfully dissent. Like Justice Meyer, "I am unwilling in the name of convenience and judicial efficiency to close my eyes to a procedure that risks influencing the jury's decisional process in some degree, however difficult to define or impossible to measure." (Internal quotation marks and citation omitted.) Therefore, I join Justice Meyer in her dissent.