STATE of Minnesota, Respondent,

v.

**Alan Ray CHRISTIANSON, Appellant.**

No. C6–83–1992.

Supreme Court of Minnesota.

Jan. 18, 1985.

C. Paul Jones, Public Defender, J. Christopher Cuneo, Stacey A. DeKalb, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Robert F. Carolan, Dakota Co. Atty., Mark Nathan Lystig, Asst. Dakota Co. Atty., Hastings, for respondent.

TODD, Justice.

Alan Christianson was convicted of first degree murder and sentenced to life imprisonment. On appeal, he argues that the trial court erred in refusing to instruct the jury on first degree manslaughter. He also contends that he was denied a fair trial because of certain evidentiary rulings and prosecutorial improprieties. We affirm.

Alan Christianson had been married for four years when he discovered, in 1982, that his wife, Jane, was having an affair with her co-employee James Shaw. Following meetings with his wife and Shaw, 'Alan seemed to accept the fact that he and Jane would divorce and he left Minnesota to take a vacation on December 1, 1982. On

December 12th, Alan telephoned Jim Shaw and threatened Shaw and his family. Shaw was frightened by these threats, but agreed to speak with Alan after work on December 13th.

Alan returned to his Eagan home on the afternoon of December 13th and found that his wife had moved her belongings out of their house. He contends that the brief reactive psychosis he was experiencing on his return to Minnesota was magnified by the shock of learning that Jane had moved.

At 3:00 p.m. on December 13th, Alan purchased a 12-gauge shotgun at the Sears store in Burnsville. The sales clerk who sold him the gun testified that Alan appeared friendly and calm. He also bought shells, but exchanged them after learning they were the wrong size. Before the gun was boxed, Alan asked the sales clerk to remove the trigger safety which prevents all guns from being fired in the store. After leaving Sears, he returned home and sawed off both the barrel and stock of the shotgun.

At 4:30 p.m., Alan arrived at Machine Tool Supply where his wife and Jim Shaw worked. His wife testified that Alan said he wanted to talk and that "he was shaking because he was so mad." He asked her why she had moved and then told her he wanted to talk to Jim Shaw. Jane would not let him through to the back offices. When Alan left to find another entrance, Jane went to Shaw's office to let him know that Alan was there. She then returned to her desk and found Alan entering by the front door. When she tried to prevent him, he pushed her across the room.

At that point, Alan asked Jane if he could have his stepdaughter for two weeks in the summertime. When Jane told him she did not know, Alan lifted the shotgun out from under his coat and pointed it at Jane. Jane then told Alan she was going to call the police. He told her that she had better not and went down the hall asking, "Where is Jim Shaw?" Alan quickly found Shaw's office and yelled for Jane "to get down here".

When Jane came to Shaw's office, Jim was sitting at his desk and Alan was waiting in the doorway. Alan asked Jane whether she had called the police. She told him that she had. Jane testified that Alan then said something to the effect that, "I guess it doesn't make any difference now. I am already in trouble." Another employee who happened to pass by Shaw's office at that moment, testified that Alan said, "I am done-in if I do and done-in if I don't."

Jane testified that Alan then sat down in a chair and laid the gun across his lap. She stated that Alan started to tell Jim how Jane had made him lose his jobs, but that Jim interrupted, saying "Hey wait a minute, she didn't make you lose your jobs." Jane recalled Jim asking Alan to put the gun away and that Alan "moved something on the gun." She testified that the conversation continued, "but then Alan shot him".

The evidence indicates that Alan shot Jim Shaw seven times. The coroner testified that at least five of the wounds would have been fatal even if Shaw had received immediate medical attention. Since the murder weapon has a fully loaded capacity of three shells, Alan had to stop and reload the gun twice in order to fire the seven shots.

After shooting Shaw, Alan left the building. He walked quickly to Jane's car and drove off. He was stopped a short distance away by Officer Kenneth Aszmann of the Eagan Police Department. As Officer Aszmann pulled alongside Jane's car, he saw that Alan had the shotgun pointed underneath his chin as if he were going to commit suicide. For approximately the next hour, Officer Aszmann tried to persuade Alan to surrender. When Alan stated he had nothing to live for, Aszmann suggested that Alan had merely winged his victim. Alan replied, "I didn't miss. I stuck the gun in his chest and fired it twice." Shortly thereafter, Alan surrendered.

After surrendering to Officer Aszmann, Alan was taken to the Eagan Police Department. Upon completion of an inventory search, Officer Aszmann accompanied Alan into an interview room adjoining the

cell block. Alan was then permitted to telephone his pastor, his mother, a woman named Stella, and his sister. Officer Aszmann remained in the interview room while these phone calls were made and took notes on what Alan was saying over the phone. Only before the last phone call was placed to Alan's sister did Officer Aszmann read Alan his *Miranda* rights.

Alan realized that Officer Aszmann was in the interview room while he was using the phone; he testified, however, that he did not know that Officer Aszmann was taking notes on what he said.

The issues presented on appeal are:

1. *Whether the evidence of premeditation was sufficient to support a conviction of first degree murder?*

2. *Whether the trial court erred in refusing to instruct the jury on first degree manslaughter?*

3. *Whether the trial court improperly admitted inadmissible evidence?*

4. *Whether various prosecutorial improprieties prevented appellant from having a fair trial?*

■ 1. In determining whether there is sufficient evidence to support a jury verdict, this court will view the evidence in the light most favorable to that verdict and decide if the jury could reasonably find the defendant guilty of the crime charged. *See State v. Lloyd,* 345 N.W.2d 240, 244 (Minn. 1984). In the present case, the prosecution had only to produce sufficient evidence to permit the jury to conclude beyond a reasonable doubt that Christianson either considered, planned or prepared for, or determined to kill James Shaw prior to his murder. Minn.Stat. § 609.18 (1982).

The following evidence supports a finding of premeditation:

(1) Christianson's statement to Jane after they argued about her affair with Shaw: "I don't get mad, I just get even."

(2) Christianson's threats against Shaw during the telephone conversation on December 12th.

(3) Christianson's purchase of the shotgun; his check to make certain he had the proper shells; and his request to have the store's trigger safety removed.

(4) Christianson's sawing off the shotgun so he could conceal it beneath his coat.

(5) Christianson's statement at Shaw's office after learning that Jane called the police: "I am done-in if I do and done-in if I don't."

(6) Christianson's release of the safety before shooting Shaw.

(7) Christianson's shooting Shaw seven times at close range in vital areas coupled with the fact that he had to reload twice in order to fire the seven shots.
and

(8) Christianson's statement to Officer Aszmann during the standoff: "I didn't miss. I stuck the gun in his chest and fired it twice."

■ On the basis of the foregoing evidence, the jury could reasonably conclude that Christianson either considered, planned or prepared for, or determined to kill James Shaw prior to his murder.

2. Christianson contends it was reversible error for the trial court to refuse to instruct the jury on first degree manslaughter. Minn.Stat. § 609.20 (1982) establishes three definitions of first degree manslaughter. Subdivision 1 includes four elements: (1) intentionally causing (2) the death of another (3) in the heat of passion (4) "provoked by such words or acts of another as would provoke a person of ordinary self-control under like circumstances." The trial court based its refusal to give a first degree manslaughter instruction on the absence of an evidentiary basis to support the provocation element.

■ The decision to withhold first degree manslaughter from the consideration of the jury was a proper exercise of the trial court's discretion under the facts of this case. *See State v. Hoffman,* 328 N.W.2d 709, 718 (Minn.1982).

■ 3. Christianson objects to the admission of evidence obtained by Officer Aszmann while present during the phone calls Christianson made. Although we be-

lieve that it is better police practice to give defendants the *Miranda* warning immediately upon detention, in this case no harm occurred since the evidence presented had no relation to the events surrounding the commission of the crime. Further, defendant had no expectation of privacy when he observed the presence of the officer at the time he used the telephone.

■ 4. Christianson also objects to the prosecuting attorney's conduct at trial. While the questioned conduct is anything but commendable, we find nothing in the record, either selectively or collectively, which violated defendant's right to a fair trial.

Affirmed.