STATE of Minnesota, Respondent,

v.

Matthew Charles GORE, Appellant.

No. C4–89–353.

Supreme Court of Minnesota.

Feb. 16, 1990.

**314**

Steven P. Russett, Asst. State Public Defender, St. Paul, for appellant.

Raymond F. Schmitz, Olmsted County Atty., Rochester, Hubert H. Humphrey, III, Atty. Gen., and Paul R. Kempainen, Asst. Atty. Gen., St. Paul, for respondent.

COYNE, Justice.

Defendant Matthew Charles Gore was convicted of murder in the first degree, Minn.Stat. § 609.185(1) (1988), in connection with the death of Valerie Gunderson, and sentenced to life imprisonment. In a bifurcated trial pursuant to the provisions of Minn.R.Crim.P. 20.02, subd. 6(2), a jury found the elements of the offense of first degree murder proved beyond a reasonable doubt, then rejected defendant's mental illness defense. On appeal, defendant contends that the trial court erred in admitting testimony in violation of the physician-patient privilege, in refusing to submit the lesser included crime of third degree manslaughter, and in instructing the jury in the first phase of the trial. Defendant also contends that he proved his defense of mental illness as a matter of law, that the trial court erred in rejecting rebuttal testimony and in declining to submit a lesser charge verdict form in the second phase of the bifurcated trial. We affirm the conviction.

Defendant and Valerie Gunderson, the daughter of a Mayo Clinic physician, started dating in the fall of 1986 when defendant was a senior and Valerie was a junior at Rochester Mayo High School. After about six months, Valerie announced to defendant that their relationship was to be casual, and although the two subsequently attended the high school prom together and although Valerie's parents encouraged defendant's involvement with their church, the defendant described their relationship over the next several months as "rocky" or "very shakey" [sic]. Defendant graduated from high school in the spring of 1987; in the fall he joined the Army and was stationed at Fort Leonard Wood, Missouri.

Defendant wrote Valerie one or two letters a week, called her weekly, and wrote letters to the Gunderson family. Valerie, then a high school senior, wrote infrequently and sometimes hung up the telephone when defendant called, but in March of 1988 they were still spending some time together when defendant was in Rochester on leave.

Early in April Valerie told defendant over the telephone that she wanted to date someone whom she had met while vacationing; defendant became angry and told her she would be "sorry." Valerie's parents considered it necessary to intervene at that point, and Mrs. Gunderson told defendant it was over.

On his arrival in Rochester on the weekend of April 23, defendant went to the Gunderson home. Valerie's father refused to admit defendant but told him that he could call Valerie later. Defendant opened his coat to show that he had no weapons. Defendant returned to the Gunderson home that afternoon and was admitted by Valerie's younger sister. Valerie refused to speak to defendant and showed him the door. When Mrs. Gunderson returned home, she saw the defendant sitting in his parked car, and after speaking with Valerie, she called the sheriff. A deputy sheriff responded to the call, told the defendant that he and Valerie were finished, threatened to call defendant's commanding officer, and ordered him to leave the area.

Defendant testified that he became hysterical over the prospect of losing both his girlfriend and his military career and decided to commit suicide. After buying a large bottle of Tylenol, he called Valerie, but she was indifferent to his threat of suicide. Defendant then went to his mother's apartment to get his fixed-blade hunting knife, which he hid under his shirt. In the meantime, Mrs. Gunderson had called one of defendant's brothers to tell him of the difficulty the Gundersons were having with defendant. Defendant and his brother had a long emotional conversation, and both defendant's mother and his brother cautioned the defendant to stay away from the Gunderson home.

Defendant then drove around looking for Valerie. He testified that when he saw Valerie and a girlfriend leave a movie theater, he realized that "she knew I could have been dead, and she didn't even care. Then I wanted to hurt her. I wanted to make her go through at least some of the pain that I was going through before I died * * * and I knew I had the knife in the side of my pants, and I knew I wanted to hurt her." Defendant followed the two young women back to the Gunderson home. When Valerie answered the doorbell, he asked her for some clothes that she had borrowed from him. She handed him a pile of clothes and while she was getting a missing article, defendant hid the knife under the pile of clothes. Defendant testified that when she returned, he held the knife "like you would when you would cut a piece of bread" and stabbed her. Valerie screamed, fell to the floor and kicked out in defense. Mrs. Gunderson and Valerie's girlfriend, who had been eavesdropping on the conversation, ran to Valerie's aid. Defendant continued to stab Valerie while the other two women tried to stop the assault. The commotion woke Dr. Gunderson, who picked up a baseball bat and chased defendant to his car.

Valerie died later that morning at St. Mary's Hospital. The pathologist testified that Valerie suffered at least seven stab wounds to her torso and neck, three of which were sufficient to cause death. Each of these stab wounds was caused by the full length of a $5\frac{1}{2}$ inch knife blade.

Defendant testified that after he left the murder scene, he tried to commit suicide by consuming the entire contents of a 50–caplet bottle of extra-strength Tylenol and about 16 tablets of Parafon Forte, a prescription drug containing acetaminophen, the active ingredient in Tylenol. Because he had left the knife at the Gunderson house, he tried to slash his wrists with glass broken from his rearview mirror. When neither the drugs nor the wrist-cutting had the desired effect, defendant drove back to his mother's apartment where he was arrested. The emergency room physician who treated defendant af-

ter his arrest testified over defendant's objection that defendant's blood test showed that he had taken only approximately 20–30 tablets of Tylenol and had only superficial cuts on his wrists.

In the first phase of the bifurcated trial, the jury rejected defendant's argument that he was guilty only of second degree felony murder and found the defendant guilty of first degree murder. In the second phase of the trial, the jury rejected defendant's mental illness defense and reaffirmed the guilty verdict.

■ Defendant first takes issue with the trial court's refusal to submit the lesser charge of first degree "heat of passion" manslaughter, Minn.Stat. § 609.20(1) (1988). To support a conviction of "heat of passion" manslaughter, the evidence must show that the defendant intentionally killed in the heat of passion and that the passion was provoked by such words or acts of another as would provoke a person of ordinary self-control under like circumstances. The decision whether to instruct the jury on a lesser charge is within the discretion of the trial court, *State v. Murphy*, 380 N.W.2d 766, 772 (Minn.1986), but should be submitted when (1) the evidence would reasonably support a conviction of the lesser crime, and (2) the evidence would also reasonably support an acquittal of the defendant of the greater crime charged. *State v. Lee*, 282 N.W.2d 896, 899 (Minn.1979).

Defendant claims as provocation Valerie's indifference and Mrs. Gunderson's jeopardizing his military career by calling the sheriff's department, but this was not the kind of conduct which would provoke a person of ordinary self-control to kill. *See generally State v. Christianson*, 361 N.W.2d 30, 33, (Minn.1985) (divorce because of another man not sufficient provocation); *State v. Hoffman*, 328 N.W.2d 709, 718 (Minn.1982) (wife's insults not requisite provocation). Accordingly, the trial court's refusal to instruct the jury on "heat of passion" manslaughter did not constitute an abuse of discretion.

■ In the second phase of the trial defendant introduced expert opinion testimony of a consulting psychologist that defendant suffered from a paranoid disorder of the erotomanic type, a major mental illness characterized by a delusional belief that one is loved by another. Defendant contends that the psychologist's testimony that defendant did not understand the wrongfulness of his acts provided a more viable diagnosis of his behavior than the testimony of the two psychiatrists and the licensed consulting psychologist who were of the opinion that defendant knew the wrongfulness and the consequences of his actions when he murdered Valerie. *See generally* Minn.Stat. § 611.026 (1988). If the evidence, including defendant's own testimony as well as the expert opinion testimony, is viewed in the light most favorable to the state, it is apparent that it was within the province of the jury to reject defendant's mental illness defense and to find defendant guilty of first degree murder. *State v. Schneider*, 402 N.W.2d 779, 784 (Minn.1987). Accordingly, we cannot conclude that as a matter of law defendant did not know the nature of his act or that it was wrong to murder Valerie Gunderson.

■ Neither are we persuaded that the trial court abused its discretion in excluding defendant's proffered rebuttal opinion testimony that defendant's agitated behavior during a mid-afternoon recess was consistent with the psychologist's diagnosis of an erotomanic delusional disorder. Rebuttal evidence is evidence which explains, contradicts, or refutes earlier evidence and is admitted at the discretion of the trial court. *State v. Eling*, 355 N.W.2d 286, 291 (Minn.1984); *State v. Walker*, 306 Minn. 105, 112, 235 N.W.2d 810, 815 (1975), *cert. denied sub nom. Walker v. Minnesota*, 426 U.S. 950, 96 S.Ct. 3172, 49 L.Ed.2d 1187 (1976). The proffered testimony, however, merely corroborated the expert's earlier testimony and was not proper rebuttal testimony.[1]

**1.** It is also notable that defendant's agitated behavior in which he was found pale, nervous and clenching his fists occurred on Monday, December 12, during a recess. Defendant's expert ob-

■ Defendant also contends that the trial court erred in declining to submit to the jury at the close of the second phase of the bifurcated trial a verdict form for second degree felony murder. It is defendant's position that Minn.R.Crim.P. 20.02, subd. 6(4)(b), can be broadly interpreted to permit the jury to determine that although the defendant understood the nature and wrongfulness of his act, mental illness prevented him from forming the intent requisite to the commission of murder in the first degree, thus permitting the rendition of a verdict of guilt of a lesser charge, based on opinion testimony concerning mental illness presented during the second phase of a bifurcated trial.

Inasmuch as defendant neither requested the trial court to submit a lesser charge verdict form after the mental illness phase of the trial nor objected when the court failed to do so, this issue, raised for the first time on appeal, is not properly before this court. We are, nevertheless, compelled to comment that a principal reason for bifurcating a trial is to prevent the jury from considering opinion testimony on the issue of intent. *State v. Bouwman*, 328 N.W.2d 703, 705 (Minn.1982). As we pointed out in *State v. Hoffman*, 328 N.W.2d 709, 716 (Minn.1982), the second phase of a bifurcated trial is limited *"solely* to a determination of whether the defendant has sustained the burden of establishing the defense of mental illness." (Emphasis added).

■ Defendant complains that the portion of the trial court's instruction set out below coerced jurors into believing that dissenting jurors must yield to the will of the majority and that a deadlocked verdict was unacceptable:

> You should not hesitate to change an opinion if convinced that your opinion is wrong. Do not let pride of opinion possess any of you to such an extent that you cannot fairly listen to the suggestion of your fellow jurors. None of us is so

wise that we cannot learn from others. You should not, however, be influenced to vote in any way on any question by the single fact that a majority of jurors or any of them favor such a decision. *You may be willing to abide by the majority vote,* but you should not surrender your honest convictions concerning the effect or the weight of the evidence for the purpose of returning a verdict solely because of the opinion of other jurors.

> \*      \*      \*      \*      \*      \*

> There are twelve of you on this jury, *and all of you must agree to a verdict.* Some of you may have been jurors in a civil matters [sic] where you were permitted after so many hours of deliberation to return a so-called five/sixths verdict \* \* \* but there are not fractional verdicts in a criminal case, and the jury's verdict must be unanimous.

(Emphasis supplied).

Having failed to raise any objection to the instructions at trial, the defendant may not obtain relief on appeal. *State v. Parker*, 417 N.W.2d 643, 647 (Minn.1988). Read in their entirety, however, the instructions are neither improper nor prejudicial. The clear gist of the instructions is that each juror must abide by his or her own honest conviction regarding defendant's criminal responsibility and that the verdict in a criminal trial, unlike that in a civil trial, cannot be fractional.

■ Finally, defendant complains that the admission, over his objection, of the testimony of the emergency room physician who had treated defendant immediately after defendant's arrest was violative of the physician-patient privilege. The trial court ruled that by testifying that after stabbing Valerie Gunderson he attempted suicide by swallowing 50 caplets of extra-strength Tylenol and about 16 tablets of a prescription drug containing the same active ingre-

---

served defendant's behavior and reported it to defendant's attorney as consistent with his diagnosis of major mental illness. At the time of the recess, the state was cross-examining this expert witness. Defendant, consequently, had an op-

portunity for redirect examination of his witness if he had chosen. Instead, he waited until Wednesday during rebuttal to ask this expert about his earlier observation.

dient and by trying to slash his wrists, the defendant impliedly waived the statutory physician-patient privilege, Minn.Stat. § 595.02, subd. 1(d) (1988). The court then permitted the state to impeach defendant by allowing defendant's treating physician to testify that defendant's acetaminophen level was inconsistent with that number of tablets and closer to a total of 20 to 30 tablets and that the cuts on his wrists were merely superficial.

The physician-patient privilege arises under Minn.Stat. § 595.02 when the defendant establishes that (1) a physician-patient relationship existed, (2) the information was the kind contemplated by the statute, (3) the information was acquired while attending the defendant, and (4) the information obtained was necessary to attend the defendant patient in a professional capacity. *State v. Staat,* 291 Minn. 394, 398, 192 N.W.2d 192, 196 (1971). The statute has been applied in criminal cases by judicial assumption. *Id.* at 398–99 n. 2, 192 N.W.2d at 196 n. 2. It is only where a medical examination is conducted solely for the purpose of obtaining evidence to be used in a criminal proceeding that we have held that the privilege does not apply because the physician-patient relationship does not exist. *E.g., State v. Emerson,* 266 Minn. 217, 224, 123 N.W.2d 382, 387 (1963).[2]

Here the police took defendant to the emergency room for treatment following an apparent suicide attempt. The blood tests taken to determine the kind and quantity of the chemicals ingested were necessary for the diagnosis and treatment of a drug overdose. The tests were not taken simply to gather evidence against the defendant. Accordingly, we agree with the trial court's conclusion that there existed a

physician-patient relationship and that the information received while attending defendant was protected from public scrutiny by a statutory privilege. Recognizing, however, that privileged information loses its privileged character when subsequently disclosed by the holder of the privilege, we have held that a client impliedly waives the privilege by discussing at a habeas hearing the contents of professional communications between client and attorney. *See State ex rel. Schuler v. Tahash,* 278 Minn. 302, 308, 154 N.W.2d 200, 205 (1967). There is, in our judgment, no significant distinction between the attorney-client privilege and the physician-patient privilege which would justify the contention that despite disclosure in open court by the patient, information or opinion based on information acquired by a physician in attending the patient in a professional capacity nevertheless retains its privileged character—unlike testimony of the content of previously confidential communication to a lawyer. As Wigmore has so plainly put it, the privilege ought not to afford a "license to perjury":

> Certainly it is a spectacle fit to increase the layman's traditional contempt for the chicanery of the law when a [party] describes at length to the jury and a crowded courtroom the details of his supposed ailment and then is permitted to suppress the available proof of his falsities by asserting that he wishes to keep the matter confidential.

8 Wigmore, *Evidence,* § 2389 at 859 (McNaughton rev. 1961).[3]

Although disclosure of privileged information by the holder of the privilege is usually said to result in implied waiver, it is no doubt more accurate to say that when

---

**2.** Defendant relies upon *State v. Fontana,* 277 Minn. 286, 152 N.W.2d 503 (1967), for the status of the physician-patient privilege in Minnesota criminal law. Through promulgation of Minn. R.Crim.P. 20.02, however, we overruled both *Fontana* and *State v. Olson,* 274 Minn. 225, 143 N.W.2d 69 (1966). *See State v. Dodis,* 314 N.W.2d 233, 239 n. 5 (Minn.1982).

**3.** Analogous are our decisions, as well as those of the United States Supreme Court, in which it has been observed that the exclusionary rule is

not a license to commit perjury. If a defendant elects to testify to certain facts, inconsistent voluntary statements made by the defendant to the police may be used to impeach his credibility even if those statements were obtained in violation of constitutional rights and are, therefore, inadmissible in the state's case-in-chief. *E.g., Oregon v. Hass,* 420 U.S. 714, 722–24, 95 S.Ct. 1215, 1220–21, 43 L.Ed.2d 570 (1975); *State v. Sutherlin,* 396 N.W.2d 238, 243 (Minn. 1986).

the holder of a privilege destroys the confidentiality of information by disclosure, the information loses its privileged character and the holder may no longer assert the privilege with respect to the disclosed information. That preclusion is, however, limited by the scope of the disclosure; here the defendant's testimony of the amount of drugs he ingested and his attempt to slash his wrists did not cause loss of the privilege with respect to unrelated communications by the defendant to the physician. Furthermore, contradiction by extrinsic evidence—as opposed to mere impeachment by cross-examination—is permitted only if testimony meets the requirements of Minn. R.Evid. 403. *See State v. Waddell*, 308 N.W.2d 303, 304 (Minn.1981). We hold in this case that the trial court did not abuse its discretion in admitting the physician's extrinsic testimony, which was appropriately limited in scope and which met the requirements of Rule 403. We also observe that in any event there is little likelihood that the testimony harmed the defense. Indeed, the physician's testimony seems to us as corroborative of defendant's testimony that he was distraught and that he has little memory of the stabbing and his suicide attempt as it is impeaching of his credibility.

Affirmed.