STATE of Minnesota, Respondent,

v.

Larry PEARSON, Appellant,

and

Larry Demetrius Pearson,
petitioner, Appellant,

v.

State of Minnesota, Respondent.

Nos. A07–1605, A08–1821.

Supreme Court of Minnesota.

Nov. 25, 2009.

Lori Swanson, Attorney General, St. Paul, MN; and Susan Gaertner, Ramsey County Attorney, Thomas R. Ragatz, Assistant Ramsey County Attorney, St. Paul, MN, for respondent.

Sharon E. Jacks, Assistant State Public Defender, St. Paul, MN, for appellant.

## OPINION

MEYER, Justice.

On May 23, 2007, a Ramsey County jury found appellant Larry Demetrius Pearson guilty of first-degree premeditated murder, in violation of Minn.Stat. § 609.185(a)(1) (2008), second-degree intentional murder, in violation of Minn.Stat. § 609.19, subd. 1(1) (2008), and the unlawful possession of a firearm, in violation of Minn.Stat. § 624.713, subd. 1 (2008), for his involvement in the death of Corodarl Merriman. The jury found Pearson not guilty of attempted murder for the shooting of Willie Merriman.[1] The trial court convicted Pearson of first-degree murder and sentenced him to life in prison without possibility of release. The court also convicted Pearson for the possession offense and sentenced him for that offense to a concurrent 60–month sentence. Pearson filed a direct appeal as well as a petition for postconviction relief, which was denied. Pearson's direct appeal was consolidated with his appeal from the denial of his postconviction petition. In his appeal, Pearson raises the following issues: (1) whether the trial court erred by admitting as rebuttal evidence a videotaped statement made by Pearson to a police officer; (2) whether the State committed misconduct; and (3) whether Pearson was denied his right to effective assistance of counsel. We affirm.

The following facts are not disputed by either party. On April 22, 2006, Pearson encountered Willie Merriman, Corodarl's brother, at a St. Paul gas station, and the two of them discussed a potential drug sale. Pearson then drove to his apartment, followed by Willie and Corodarl in a Chevrolet Astro van. Pearson briefly went into his apartment, while the Merrimans remained in the parking lot behind the building. When Pearson reemerged, he and Willie had a conversation that escalated into an altercation. At the time, Corodarl was sitting in the van. During the altercation, Willie ran away from the van, and at some point, Pearson shot Corodarl three times. After the shooting, Willie returned to the van and drove away to find help for Corodarl. Pearson went to a cousin's apartment to remove blood and gunpowder residue by washing his hands with bleach. Pearson then went to his girlfriend's apartment, where he hid until he was arrested the next morning. The police found a gun and two unused bullets hidden at that apartment. Bullet fragments recovered from Corodarl's body matched the gun found at the apartment. An assistant medical examiner testified that Corodarl's death was caused by multiple gunshot wounds, and that at least two of the gunshot wounds, one to the skull and one to the lungs, would have been fatal. The police also found that the right front passenger door window of the Merrimans' van was broken, and pieces of the window were found inside the car. Blood splatter was found throughout the back half of the van.

Pearson admits that he shot and killed Corodarl Merriman on April 22, 2006, but claims that he did so in self-defense. At

---

1. Pearson was indicted on two counts of murder for the death of Corodarl Merriman, one count of attempted murder for the shooting of Willie Merriman, and one count of unlawful possession of a firearm.

trial, Pearson and Willie Merriman were the only eyewitnesses who testified to the shooting, and they presented very different versions of what took place.

According to Willie's trial testimony, Pearson tried to sell marijuana to Corodarl and Willie, but when Willie did not have enough money, they agreed that the Merrimans would follow Pearson back to his apartment building. After Pearson re-emerged from his apartment building, Pearson told Willie to get out of the van. Pearson asked Willie if Corodarl was with the police. When Willie replied that Corodarl was not and asked to see the marijuana, Pearson pulled out a gun and shot at Willie's head. The shot missed, and Willie ran from the van, leaving Corodarl behind. Willie testified that he watched Pearson approach the van and begin shooting as Corodarl scrambled to the back of the van. Pearson then opened the front passenger door of the van, knelt over the seat, and shot again. Willie ran back to the van and wrestled with Pearson for the gun, but one of Pearson's friends came from behind and started choking Willie. After the confrontation, Pearson and his friend fled on foot, while Willie drove away from the lot to seek help.

According to Pearson's trial testimony, while at the gas station, Willie approached him about a party. They also talked about, but did not complete, a sale of crack cocaine. When he left the gas station, Pearson did not realize that the Merrimans were following him back to the apartment. Pearson briefly went inside his apartment, and when he came out, he was surprised that the Merrimans were in the parking lot. Pearson was told to get in the front passenger seat of the van. Corodarl sat in the back seat with a gun aimed at him, as Willie said to him, "you know what it is." As Pearson reached for his own gun and shot at Corodarl in self-defense, Willie fled out the driver's front door. According to Pearson, he tried to follow Willie out the driver's side of the van, but Corodarl grabbed his arm preventing his escape. Pearson then fired two more shots at Corodarl before making it out of the van. Pearson stated that he left the area in his vehicle after a brief struggle with Willie, who had returned to the van.

In May 2007, a Ramsey County jury found Pearson guilty of both murder counts for the death of Corodarl and the unlawful possession of a firearm count. The jury found Pearson not guilty of attempting to murder Willie. Pearson appealed the judgment but moved for, and was granted, a stay to institute postconviction proceedings. In his postconviction petition, Pearson asserted that he was denied his Sixth Amendment right to effective assistance of counsel. After a hearing, the postconviction court denied Pearson's petition in September 2008, and Pearson appealed from that denial. We consolidated both of Pearson's appeals.

I.

■ We first address Pearson's argument that the trial court erred when it admitted, as rebuttal evidence, a videotaped statement made by Pearson to a police officer. Two days after the shooting, Pearson voluntarily requested to speak with Officer Aguirre, the brother of his best friend. At the time, Pearson generally denied involvement in the shooting, though he acknowledged that he may have handled the gun used in the shooting. Pearson told Officer Aguirre that "I'm just tryin' to holler at you to see what was goin' on." In his testimony at trial, Pearson admitted that he lied to Officer Aguirre throughout their conversation and that he was trying to get information about the case against him from Officer Aguirre.

When the State sought to offer the videotape of this conversation as rebuttal to Pearson's claim of self-defense, Pearson objected arguing that the videotaped statement was improper rebuttal evidence. The trial court denied the defense's motion to exclude the videotaped statement and admitted it to rebut "any implication that [Pearson] made concerning his intent at the time" of the statement. The trial court also noted that the videotaped statement was relevant to Pearson's credibility.

■■■■ On appeal, Pearson renews his argument that the videotaped statement was improper rebuttal evidence. Under Minn. R.Crim. P. 26.03, subd. 11(g), the State may offer rebuttal evidence to explain, contradict, or refute the defendant's evidence. *State v. Gore,* 451 N.W.2d 313, 316 (Minn.1990). The decision of "what constitutes proper rebuttal evidence rests almost wholly in the discretion of the trial court." *State v. Sullivan,* 502 N.W.2d 200, 203 (Minn.1993). We will only reverse a trial court's decision regarding rebuttal evidence upon a showing of a clear abuse of discretion. *State v. Gutierrez,* 667 N.W.2d 426, 435 (Minn.2003).

Pearson first contends that the videotaped statement did not rebut any of his testimony and was merely cumulative because Pearson had already admitted at trial that he had lied in his videotaped statement to Officer Aguirre. In his testimony, Pearson conceded that the majority of what he said during this conversation with Officer Aguirre was "junk" and asserted that his trial testimony was the truth. Pearson explained that, in talking with Office Aguirre, he was trying to find out what evidence the police had against him. But while the jury was aware that Pearson's trial testimony was inconsistent with his statement to Officer Aguirre, the

jury still had to determine the credibility of Pearson's explanation. The trial court reasoned that "the videotape is the best and fairest way for the evidence to come in; ... it gives the jury an opportunity to view what really happened rather than some artificial cross-examination which has already occurred." We agree with the trial court that the videotape was the best evidence available for the jury to use in evaluating the credibility of Pearson's explanation of why he lied to Officer Aguirre and, in turn, the credibility of his trial testimony that he shot Corodarl in self-defense. We, therefore, conclude that the trial court did not abuse its broad discretion when it admitted the videotaped statement into evidence.[2]

■■■■ Pearson's second argument concerning the videotape is that it should have been excluded under Minn. R. Evid. 403 because its probative value "is substantially outweighed by the danger of unfair prejudice." Pearson again argues that the videotape has no probative value because it is merely cumulative. The State contends that a Rule 403 argument was never raised below. A trial court's determinations under Rule 403 are reviewed for an abuse of discretion, and we will only reverse a trial court's decision if there was actual prejudice to the defendant. *State v. Schulz,* 691 N.W.2d 474, 477 (Minn.2005). In order to cause unfair prejudice, the evidence must persuade by illegitimate means. *Id.* at 478.

As noted above, the videotape was highly probative in that it allowed the jury to draw its own inferences regarding Pearson's explanation as to why he lied to Officer Aguirre and, in turn, the credibility of his claim of self-defense. Pearson claims, however, that the videotape depict-

2. Because the videotape was admissible as rebuttal evidence, we need not address Pearson's argument that the videotape was improper character evidence.

ed him as a "vulgar jailbird" and therefore was unfairly prejudicial. We conclude that, although the jury may have viewed Pearson in a negative light because of his language and demeanor on the videotape, the potential for unfair prejudice from the videotape did not outweigh the videotape's probative value. As a result, the trial court did not abuse its discretion when it allowed the videotape to be introduced into evidence.

■ Pearson argues for the first time on appeal that the trial court committed plain error by not sua sponte redacting certain portions of the videotaped statement. Specifically, Pearson contends that the trial court should have redacted Pearson's references to obtaining counsel, his reference to his girlfriend's possible abortion, and references to his possible bail and sentence.

■ Generally, when a defendant fails to raise an argument in the trial court, the plain error doctrine controls our review. *See State v. Blom,* 682 N.W.2d 578, 614 (Minn.2004) (explaining that although the defendant argued at trial that his statement was inadmissible under Minn. R. Evid. 410, the plain error doctrine controlled the court's review of the defendant's argument, raised for the first time on appeal, that his statement was inadmissible because it was involuntary). The plain error doctrine encourages defendants to object while in the trial court so that any errors can be corrected before their full impact is realized. *State v. Maurstad,* 733 N.W.2d 141, 153 (Minn.2007). To establish plain error, an appellant must show: (1) that there was error; (2) which was plain; and (3) which affected the appellant's substantial rights. *State v. Griller,* 583 N.W.2d 736, 740 (Minn.1998). If these three prongs are met, we then assess whether we should address the error to ensure fairness and the integrity of the judicial proceedings. *Id.* Because Pearson needs to prove all parts of the plain error test, we need not analyze each separate part individually. *See Everson,* 749 N.W.2d at 349; *State v. Goelz,* 743 N.W.2d 249, 258 (Minn.2007).

Relying on *State v. Juarez,* 572 N.W.2d 286, 290–91 (Minn.1997), Pearson claims that "allowing the jury to hear [his] statement about his desire for an attorney violated well-settled law that the state cannot use a defendant's exercise of his right to counsel against him." We agree.

In *Juarez,* the defendant's interrogation with police was admitted into evidence and included his statement, "I'm gonna have to get a lawyer next." *Id.* at 290. We held that it was error for the jury to be informed of Juarez's request for counsel because the jury may have treated the request as a badge of guilt. *Id.* at 291.

Pearson's statement contained several more references to obtaining an attorney than the one reference in *Juarez.* During Pearson's interview with Officer Aguirre, Pearson's need for a lawyer was mentioned six times. As the interview started, Officer Aguirre brought up the fact that Pearson "had asked for a lawyer before." When told to give his side of the story, Pearson said, "I need to figure out [who] my lawyer is. [She] was going to find a lawyer for me." Pearson later said, "It will all figure out. I told you I have a [good] attorney by in the morning." Pearson then asked if he could make a call to a "girl": "I'm just tellin' her to hurry up, hurry up and send that attorney and send that attorney up here to see me." (After this request to make a call about an attorney, Pearson made at least six more references to getting a phone call.) Pearson also refused to tell Officer Aguirre exactly what happened the day of the shooting so that "when it comes time for my lawyer to be here," the story would not already have

been told. Finally, when Officer Aguirre was trying to impart the seriousness of the charges to Pearson, Pearson said, "That, that's what I'm tryin' to see. I should have probably like a decent attorney a good attorney."

Based on Pearson's numerous references to getting an attorney, the jury may have inferred that he was somehow concealing his guilt. Thus, the trial court erred in admitting the statement without first redacting Pearson's statements about obtaining an attorney. However, our analysis does not end here. We must next consider whether the trial court's admission of Pearson's references to getting an attorney affected Pearson's "substantial rights."

An error affects defendant's substantial rights if the error was prejudicial and affected the outcome of the case. *Griller*, 583 N.W.2d at 741. An error is prejudicial if there is a "reasonable likelihood" that the error "had a significant effect" on the jury's verdict. *Id.* at 744 (internal quotation marks omitted).

At trial, claiming self-defense, Pearson conceded that he shot and killed Corodarl. Thus, the primary issue for the jury was whether Pearson had acted in self-defense. There were several evidentiary inconsistencies with that theory. The record indicates that Pearson admitted taking steps to conceal his involvement in the shooting. Those steps included fleeing the scene, washing his hands with bleach to remove blood and gunpowder residue, hiding from the police, hiding the gun used in killing Corodarl, and trying to flush bullets from the gun down the toilet. Pearson also lied during his statement to Officer Aguirre about his involvement in the murder. Further, the physical evidence, including the locations of Corodarl's wounds, is hard to reconcile with Pearson's version of events. Finally, the trial court instructed the jury that no crime is committed if a killing was justifiable because of self-defense and that the State had the burden of proving beyond a reasonable doubt that Pearson did not act in self-defense. Because the jury found Pearson guilty of first-degree and second-degree murder, it had to have rejected Pearson's claim that he acted in self-defense. Thus, there is no reasonable likelihood that the trial court's erroneous admission of Pearson's references to getting an attorney had a significant effect on the jury's verdict, and therefore the error did not affect Pearson's substantial rights.

As for the reference to the possibility that Pearson's girlfriend might terminate her pregnancy and the discussion about Pearson's likely bail and sentence, we conclude that if there were errors that were plain, the evidence outlined above demonstrates that the errors did not affect Pearson's substantial rights. It is highly unlikely that references to Pearson's girlfriend terminating her pregnancy and to the possibility of bail and sentence played a significant, if any, role in the jury's rejection of his self-defense claim.

In sum, Pearson's references to obtaining an attorney, his reference to his girlfriend's possible abortion, and references to his possible bail and sentence did not affect Pearson's substantial rights because there is no reasonable likelihood that they had a significant effect on the jury's rejection of Pearson's self-defense claim. Therefore, we hold that the trial court did not commit plain error when it failed to sua sponte redact these references from Pearson's videotaped statement.

## II.

Pearson's next claim involves allegations of prosecutorial misconduct, not objected to at trial. Pearson claims that

the State committed misconduct by, among other things, implying that the shooting of Corodarl stemmed from a robbery and by disparaging his theory of self-defense. We review claims of unobjected-to prosecutorial misconduct for plain error under the *Griller* framework listed above. *State v. Ramey*, 721 N.W.2d 294, 299 (Minn.2006). If the defendant demonstrates that there was error which was plain, the burden shifts to the State to demonstrate "that its misconduct did not prejudice the defendant's substantial rights." *Id.* at 300. The State must show that there is no reasonable likelihood that absence of the misconduct would have had a significant effect on the jury verdict. *Id.* at 302.

### A.

■ Pearson first claims that the State improperly suggested during closing argument that the shooting may have occurred as a result of Pearson attempting to rob the Merrimans. During its closing argument, the State said that Willie had money on him, which "provides a motive for a robbery." Pearson contends that this allusion to robbery was not supported by the record because when Willie was asked if Pearson "was going to jack you," that is, rob him, Willie responded "No, he, he didn't ask for money or nothing. He just pulled out a gun and started shooting." Pearson further claims that the State's allusion to robbery was in direct contrast with the State's position earlier at trial when it informed the court that there was "no allegation that this was a robbery or that any property was going to be taken from Willie Merriman or Corodarl Merriman at the time of the offense." Pearson

contends that the State's earlier position was an intentional misrepresentation.[3]

■ In closing argument, a lawyer may present all legitimate arguments on the evidence and all proper inferences that can be drawn from that evidence. *State v. Wahlberg*, 296 N.W.2d 408, 419 (Minn. 1980). But a lawyer may not speculate without a factual basis. *See State v. Thompson*, 578 N.W.2d 734, 742 (Minn. 1998). Although Willie did have money on him, the State's suggestion that Pearson was trying to rob the Merrimans is questionable at best. But the State's mention of robbery was merely in passing—the State's reference to robbery as a motive and Pearson's previous robbery convictions was only one page out of 22 pages of argument. Even if we assume that the mention of robbery was error, we are satisfied on the record presented that there is no reasonable likelihood that if the error had not occurred, the jury's verdict would have been different. Pearson was free to argue to the jury a different set of reasonable inferences based on the evidence presented, and his decision not to address the State's suggestion of robbery implies that the comments were not prejudicial. *See State v. Whittaker*, 568 N.W.2d 440, 450 (Minn.1997) ("The defendant's failure to object implies that the comments [about the defendant's choice to remain silent] were not prejudicial.").

Pearson further claims that the State improperly used his previous robbery convictions to show Pearson's propensity to commit robberies. Although the State mentioned Pearson's robbery convictions and then immediately alluded to robbery

---

3. The State took the earlier position in an effort to convince the trial court that Pearson's robbery convictions should be admitted under Minn. R. Evid. 609 because Pearson's convictions were not similar to the current crime. The convictions were admitted.

Pearson does not claim the convictions were improperly admitted. Nothing in this record supports Pearson's allegation that the State intentionally misrepresented its position before the trial court.

as a motive for the shooting, the record does not reflect an attempt by the State to connect the two as character evidence. As stated above, the mention of robbery was merely a fleeting reference in the State's closing argument. In addition, we assume that jurors follow the trial court's instructions, and we have held that such instructions mitigate improper arguments by the State. *State v. Washington*, 521 N.W.2d 35, 40 (Minn.1994). In this case, the trial court properly instructed the jury to consider Pearson's convictions only for their effect on the weight of Pearson's testimony. The trial court also instructed the jury that counsels' arguments are not evidence. Viewing the State's closing argument as a whole and given the evidence against Pearson, we conclude that the State has demonstrated that any references to Pearson's robbery convictions did not prejudice his substantial rights or constitute misconduct requiring a new trial.

### B.

Pearson next claims that the State improperly disparaged the defense's theory of self-defense by stating that "in light of all the evidence, that was the only defense left to explain what he did." The State continued along this line of argument:

> So the defendant couldn't say someone else did it, because that wouldn't work. He can't say it was an accident.... That only leaves self-defense to explain what happened.... Why would he say that [he tried to get out the driver's side]? Well, he's gotta explain two more shots. He can't just get out. He's gotta explain to you how he was saving his own life by shooting the victim two more times.

In *State v. Williams*, 525 N.W.2d 538, 549 (Minn.1994), we held that it is improper during closing arguments for the State to invite jurors to speculate as to the motivation for a defendant to try the case a specific way. We specifically said that prosecutors may not belittle a line of defense in the abstract or "suggest that the defendant raised it because that was the only defense that 'might work.'" *Id.* Pearson claims that the State's argument here belittled the theory of self-defense in the abstract. The State replies that it did not disparage self-defense as a theory in the abstract; instead, it claimed that, in its context, the State was arguing that Pearson tailored his self-defense testimony to fit the known facts. On this record, Pearson specifically requested to speak with Officer Aguirre to get information about the State's case, and perhaps, to tailor his defense to the evidence against him.

We need not decide here if the State's closing argument was misconduct because, in any event, it did not prejudice Pearson's substantial rights. Viewing the closing argument as a whole, the complained-of portion is just three lines in a much longer attack on Pearson's self-defense claim. For instance, the State also says in its closing that Pearson's actions did not reflect the actions of someone who had just acted in self-defense. As stated above, given the limited nature of the allegedly improper argument and strength of the evidence against Pearson, we conclude that there is no reasonable likelihood that any misconduct had a significant effect on the jury verdict.

### C.

Pearson makes a number of other claims of prosecutorial misconduct, arguing that it was improper for the State to tell the court that it had no intention to play the videotape of Pearson's statement to Officer Aguirre, that two witnesses improperly referenced Pearson's criminal record, and that the State, in closing argument,

vouched for the veracity of Willie's testimony. Because we are satisfied that these incidents did not affect Pearson's substantial rights, we hold that Pearson is not entitled to any relief on these claims.

## III.

■■■■■ Finally, Pearson raises several claims of ineffective assistance of counsel. These claims were raised in Pearson's postconviction proceedings. To establish ineffective assistance of counsel, Pearson must prove that his "counsel's representation fell below an objective standard of reasonableness, and that a reasonable probability exists that the outcome [of the proceeding] would have been different but for counsel's errors." *State v. Lahue*, 585 N.W.2d 785, 789 (Minn.1998). A strong presumption exists in favor of finding that counsel's representation was reasonable, and particular deference is given to matters of trial strategy, including which witnesses to call and what information to present to the jury. *Id.* at 789–90. Moreover, a reasonable probability requires "a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). We review de novo the postconviction court's denials of Pearson's claims because ineffective assistance of counsel claims are mixed questions of law and fact. *Opsahl v. State*, 677 N.W.2d 414, 420 (Minn.2004).

■■■■ Pearson alleges that his trial counsel failed to fully pursue the suppression of the videotape, failed to properly redact the videotape, and failed to elicit information about Corodarl's prior acts. The postconviction court denied Pearson's ineffective assistance of counsel claims because it could not say that there was "a reasonable probability that, but for counsel's possible errors, the result of the proceeding would have been different." The

court also gave a "high degree of deference" to the conduct of Pearson's counsel and concluded that there was "no basis for a finding of ineffective assistance of counsel." With respect to the videotape, having already concluded that its admission did not affect Pearson's substantial rights, we also conclude that there is no reasonable probability that, but for Pearson's counsel's alleged errors, the outcome of the proceedings would have been different.

■■■■ Pearson also alleges that his trial counsel should have cross-examined Willie about Corodarl's prior bad acts as a juvenile after Willie testified that Corodarl was a peacemaker. Decisions about evidence and objections are matters of trial strategy. *See Leake v. State*, 737 N.W.2d 531, 542–43 (Minn.2007). We give particular deference to and will not second-guess the decisions of counsel regarding trial strategy. *Id.* at 536; *Lahue*, 585 N.W.2d at 789. Because we conclude that the claimed ineffective assistance here involves trial strategy, we hold that Pearson's ineffective assistance of counsel claim necessarily fails.

Affirmed.

## CONCURRENCE

PAGE, Justice (concurring).

Although I would affirm Pearson's convictions, I write separately because the court misconstrues our holding in *State v. Juarez*, 572 N.W.2d 286 (Minn.1997), and erroneously concludes that allowing the jury to hear the portions of Pearson's statements referencing a lawyer was error.

On April 23, 2006, Pearson was arrested for the shooting death of Corodarl Merriman. The day after his arrest, Pearson voluntarily requested to speak with Officer Aguirre, the brother of his best friend. At the time, Pearson generally denied involvement in the shooting, though he ac-

knowledged that he may have handled the gun used in the shooting. Pearson told Officer Aguirre that "I'm just tryin' to holler at you to see what was goin' on." In his testimony at trial, Pearson admitted that he lied to Officer Aguirre throughout their conversation and that he was trying to get information about the case against him from Officer Aguirre. The State sought to offer the videotape recording of this conversation as rebuttal to Pearson's claim of self-defense. The trial court denied Pearson's motion to exclude the videotape and admitted it to rebut "any implication that [Pearson] made concerning his intent at the time" of the statement. The trial court also noted that the videotape was relevant to Pearson's credibility. After the parties agreed on three parts to redact from the video, it was played for the jury.

Pearson argues that the trial court erred by not sua sponte redacting certain other portions of the videotaped conversation with Officer Aguirre. Pearson did not object to the admission of these references. In fact, the record indicates that counsel for the State and for Pearson worked together to edit the videotape and to exclude materials that both parties agreed should not be included. Although the parties redacted three parts of the videotape, they did not redact any of the references about which Pearson now complains. Thus, not only was there no objection by Pearson to the videotape being shown to the jury, Pearson actually consented to the contents of the videotape as shown.

The error claimed by Pearson falls under the invited error doctrine, which prevents Pearson from asserting on appeal an error that he was complicit in during the trial. *See State v. Everson,* 749 N.W.2d 340, 348–49 (Minn.2008). "The invited er-

ror doctrine does not apply, however, if an error meets all four parts of the plain error test." *Id.* at 349. To establish plain error, an appellant must show: (1) that there was error; (2) which was plain; and (3) which affected the appellant's substantial rights. *State v. Griller,* 583 N.W.2d 736, 740 (Minn.1998). If these three prongs are met, we then assess (4) whether we should address the error to ensure fairness and the integrity of the judicial proceedings. *Id.* Because Pearson needs to prove all parts of the plain error test, we need not analyze each separate part individually. *See Everson,* 749 N.W.2d at 349; *State v. Goelz,* 743 N.W.2d 249, 258 (Minn.2007). Here, the admission of the unredacted portions of the videotape about which Pearson now complains does not satisfy the plain error test, and under the invited error doctrine, Pearson should be foreclosed from raising this issue on appeal. However, the court, relying on *State v. Juarez,* agrees with Pearson's contention that "allowing the jury to hear [his] statement about his desire for an attorney violated well-settled law that the state cannot use a defendant's exercise of his right to counsel against him." 572 N.W.2d at 290–91.

The court's reliance on *Juarez* is misplaced. In *Juarez,* the defendant was arrested and interrogated on suspicion of sexually assaulting children. *Id.* at 286. During the trial, a portion of Juarez's taped interrogation that was played for the jury included the statement, "I'm gonna have to get a lawyer next." *Id.* at 288, 290, 292. We held that the issue in *Juarez* was not whether the defendant invoked his right to counsel, but rather whether a reasonable jury hearing this statement would likely conclude that Juarez was requesting an attorney. *Id.* at 291.[1] We went on to say that it was error for the

---

1. We favorably cited to the court of appeals'

conclusion that "[i]t is not the legal effect of

jury to be informed of Juarez's request for counsel because the jury could treat the request as a badge of guilt. *Id.* at 291. We based this holding on the United States Supreme Court's ruling that a defendant's choice to exercise his constitutional right to counsel may not be used against him at trial. *Id.* (citing *Miranda v. Arizona,* 384 U.S. 436, 468 n. 37, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). Similarly, in *State v. Hall,* we concluded that allowing the jury to hear the final portion of the defendant's statement, which said, "So what's the deal man? You gonna give me a lawyer or what?" was error because it left the jury likely to infer that the defendant was concealing his guilt. 764 N.W.2d 837, 841–42 (Minn.2009).

We have never, however, held that every fleeting reference made by a suspect to the words "lawyer," "counsel," or "attorney" during an interrogation constitutes a request for counsel. Nor have we ever held that it is error for a jury to hear such references. In *State v. Hale,* 453 N.W.2d 704, 708 (Minn.1990), we held that a suspect's fleeting, off-hand comment about his future need for an attorney was "not even arguably an invocation of his [ ] right to counsel." Thus, if a statement, viewed in the context in which it is made, does not arguably suggest that the defendant wants to terminate the interrogation until counsel is present, further questioning is allowed. *State v. Risk,* 598 N.W.2d 642, 649 (Minn. 1999).

The facts in *Pearson* are substantially different from the facts in *Juarez* and *Hall.* In *Juarez* and *Hall,* the last statements the juries heard from the taped interrogations could arguably be perceived by the jury as an invocation of the defendant's right to counsel. The cessation of interrogation after the defendant men-

tioned a lawyer could reasonably lead a jury to infer that the defendant was invoking his right to counsel and the purpose of the invocation was to end the interrogation and "conceal his guilt." However, the facts of *Pearson* do not support such an inference. Here, Pearson voluntarily spoke to a friend who happened to also be a police officer and sought to gain information from the officer. No interrogation took place. During that conversation, Pearson made the following statements, "I need to figure out who ... my lawyer is. [She] was going to find a lawyer for me.... And I called her and told her what's going on." Pearson also asked Officer Aguirre if he could call "that girl. I'm just tellin' her to hurry up, hurry up and send that attorney ... up here to see me." Viewed in context, these fleeting references to the words "lawyer" and "attorney" do not even arguably constitute requests for counsel and are not likely to be viewed by any juror as requests for counsel or as an effort to conceal guilt. Further, the conversation with Officer Aguirre continued after the references to a lawyer. Because the references to a lawyer were in passing and did not end the interrogation, the references were not likely to be viewed as a badge of guilt. On the record presented, I would conclude that because Pearson's statements, when taken in context, would not likely lead a jury to believe that Pearson was invoking his right to counsel or be seen as a badge of guilt, the trial court's failure to sua sponte redact the references was not error, much less an error that was plain. On that basis, his claim fails.

Juarez's ambiguous statement that is at issue, rather it is its prejudicial effect on the jury. From all the jury was allowed to hear, Juarez

did invoke his right to counsel." *Juarez,* 572 N.W.2d at 291 (internal citations omitted).